IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAMONT GEIGER, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 22-2458 |
| | : | |
| v. | : | |
| | : | |
| POLICE OFFICER TYLER CONROY, | : | |
| BADGE #2572; POLICE OFFICER | : | |
| DONALD MAWSON, BADGE # 1322; | : | |
| POLICE OFFICER ALEXANDER | : | |
| MCCHORD, BADGE # 6207; POLICE | : | |
| OFFICER KATHRYN MCCHORD, | : | |
| BADGE # 1710; POLICE OFFICER | : | |
| SANTIAGO, BADGE # 7246; | : | |
| DETECTIVE, BADGE # 665; | : | |
| DETECTIVE KELLY GALLOGHER, | : | |
| BADGE # 901; DETECTIVE HALL, | : | |
| BADGE # 915; and LT. METELLUS, | : | |
| BADGE # 406, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                    March 20, 2023

The *pro se* plaintiff, who is proceeding *in forma pauperis* and who identifies himself as a

sovereign citizen,[1] commenced this action by filing a complaint against several City of

---

[1]                    *Concerning So-Called Sovereign Citizens*

Individuals identifying themselves as "[s]o-called sovereign citizens argue that, though they are born and reside in the United States, they are their own sovereigns and are not United States Citizens." *Pinckney v. U.S. Gov't – I.R.S.*, C/A No. 2:19-3046-BHH-BM, 2020 WL 3474011, at *3 (D.S.C. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 3473584 (D.S.C. June 25, 2020). These purported "sovereign citizens" "believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *White v. Tennessee*, No. 14-CV-115, 2014 WL 3908203, at *4 (E.D. Tenn. Aug. 11, 2014) (quoting *United States v. Ulloa*, 511 F. App'x 105, 106 n.1 (2d Cir. 2013)); *see also* Southern Poverty Law Center, *Sovereign Citizens Movement*, https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited March 16, 2023) (providing historical background, description of belief system, and explanation of purported legal theories of sovereign citizen movement in United States); FBI Law Enforcement Bulletin, *Sovereign Citizens: A Growing Domestic Threat to Law Enforcement* (Sept. 1, 2011), https://leb.fbi.gov/articles/featured-articles/sovereign-citizens-a-growing-domestic-threat-to-law-enforcement (describing sovereign citizen movement as domestic terrorism threat). "As such, sovereign citizens believe they do not have to pay taxes, pull over for police, or obey any law that they do

Philadelphia[2] law enforcement officers in which he raised a variety of constitutional claims under 42 U.S.C. § 1983 arising out of his 2019 arrest in Philadelphia, the criminal charges filed against him, and his ongoing, almost four-years-old criminal prosecution. This court screened the complaint pursuant to 28 U.S.C. § 1915(e)(2), dismissed most of the claims, stayed certain claims that potentially would impugn the plaintiff's ongoing criminal prosecution, and allowed only his claim that two City police officers used excessive force when arresting him to pass statutory screening and proceed to service. One of those officers has been served and has answered the complaint, and the other has not been served because the City's Law Department has indicated that there is no employee with the name provided by the plaintiff. Yet, despite the clear lack of service on this officer, the plaintiff has moved to have the clerk enter default against him.

In addition to the issue relating to the lack of service on one officer and the plaintiff's frivolous request for entry of default, the plaintiff has now filed a motion for the appointment of counsel, a motion for leave to file an amended complaint, two potential amended complaints, and

---

not particularly agree with. Their ideology relates to any law, at any level of government." Michael N. Colacci, *Sovereign Citizens: A Cult Movement That Demands Legislative Resistance*, 17 Rutgers J.L. & Religion 153, 153–54 (2015).

    "Sovereign Citizens overwhelmingly proceed as pro se litigants, who as an overall group, add to American courts' backlog, specifically due to their filings using layman's arguments." Mellie Ligon, *The Sovereign Movement: A Comparative Analysis with Similar Foreign Movements and Takeaways for the United States Judicial System*, 35 Emory Int'l L. Rev. 297, 297 (2021); *see also* Jessica K. Phillips, *Not All Pro Se Litigants are Created Equally: Examining the Need for New Pro Se Litigant Classifications Through the Lens of the Sovereign Citizen Movement*, Georgetown J.L. Ethics 1221, 1228 (2016) ("Through frivolous filings, false liens, and a variety of other tactics designed to take advantage of the leniency afforded to pro se litigants by the judicial system, Sovereign Citizen pro se litigants compound the already ballooning federal and state court backlogs. The delays caused by Sovereign Citizens hurt 'real' pro se litigants that need assistance from courts and judges to have a legitimate chance to win cases against represented parties." (internal footnote omitted)). Courts confronted with sovereign citizens' legal theories "summarily reject[]" them as frivolous. *United States v. Sterling*, 738 F.3d 228, 233 n.1 (11th Cir. 2013); *see United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011) ("Regardless of an individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented."); *Weese v. Maryland*, Civ. A. No. PWG-17-2584, 2017 WL 8780880, at *1 (D. Md. Dec. 8, 2017) ("The complaint parrots the language of the now infamous 'flesh and blood' movement, similar to the beliefs and rhetoric espoused by the American Moorish and Sovereign Citizen movements, all of which have been uniformly rejected as legally frivolous by this and other Courts across the country." (internal footnote omitted)).

[2] Hereinafter referred to as "City" or "the City."

a separately filed exhibit. As for the motion for leave to file an amended complaint, it appears that the plaintiff is seeking to not only assert individual- and official-capacity claims for alleged constitutional violations against the law enforcement officers involved in his arrest, charges, and criminal investigation, but he also seeks to assert claims against several public defenders who have represented him in his criminal case and the Court of Common Pleas Judge who has presided over this case. The plaintiff also seeks to assert (1) a variety of Fourth Amendment claims, such as the use of excessive force in effecting his arrest, false arrest, illegal search, false imprisonment, and malicious prosecution against the defendant law enforcement officers; (2) claims for violations of his Fourteenth Amendment due process rights against his public defenders and the Court of Common Pleas Judge; (3) claims for violations of his Fourteenth Amendment due process rights against the defendant law enforcement officers insofar as they allegedly fabricated evidence and committed perjury while testifying during two pretrial court proceedings; (4) a claim for deliberate indifference to his serious medical needs relating to the insufficient medical care he claims to have received after excessive force was allegedly used during his arrest; (5) claims for supervisory liability; (6) conspiracy claims under 42 U.S.C. §§ 1983, 1985; and (7) civil claims based on a violation of a federal criminal statute. The sole defendant police officer currently in the case has expressed that he does not oppose the court granting the plaintiff leave to amend the complaint.

After thoroughly reviewing the plaintiff's submissions, and despite the lack of opposition to the motion for leave to file an amended complaint by the defendant, the court will deny in part and grant in part the motion for leave to amend. The court will reluctantly grant the part of the motion seeking to add claims for false arrest, false imprisonment, and illegal search in violation of the Fourth Amendment and will also stay those claims pending the ultimate resolution of the plaintiff's criminal case. In all other respects, the court will deny the motion for leave to amend

and will vacate the part of the prior screening memorandum opinion and order which improvidently permitted the plaintiff's excessive force claims to proceed because the statute of limitations bars those claims. The court will also deny the plaintiff's motion for appointment of counsel and request for entry of default.

## I.      PROCEDURAL HISTORY

The *pro se* plaintiff, Lamont Geiger ("Geiger"), commenced this action by filing an application for leave to proceed *in forma pauperis*, prisoner trust fund account statement, and complaint, which the clerk of court docketed on June 22, 2022.[3] *See* Doc. Nos. 1–3. After reviewing the *in forma pauperis* application, the court determined that it was incomplete in multiple respects and, as such, entered an order on June 29, 2022, which required Geiger to fully complete the application and return it to the clerk of court. *See* June 29, 2022 Order at 1–2, Doc. No. 5. In response to this order, Geiger completed and returned a new *in forma pauperis* application, which the clerk of court docketed on July 29, 2022 (the "IFP Application"). *See* Doc. No. 6.

Regarding the complaint, Geiger named nine defendants, all allegedly working for the City's Police Department: (1) Police Officer Tyler Conroy ("Officer Conroy"); (2) Police Officer Donald Mawson ("Officer Mawson"); (3) Police Officer Alexander McChord ("Officer A. McChord"); (4) Police Officer Kathryn McChord; (5) Police Officer Santiago ("Officer Santiago"); (6) "Detective Badge [#] 665"; (7) Detective Kelly Gallagher ("Detective Gallagher");[4] (8) Detective Hall; and (9) Lieutenant Metellus ("Lt. Metellus").[5] *See* Compl. at

---

[3] At the time he filed the complaint, Geiger alleged that he was a pretrial detainee incarcerated at the Philadelphia Industrial Correctional Center ("PICC") in Philadelphia. *See* Compl. at ECF p. 3, Doc. No. 3.

[4] As explained *infra*, Geiger misspelled this defendant's last name. The court will use the correct spelling throughout the rest of this memorandum opinion.

[5] In the caption of the complaint, Geiger named only Officer Conroy as a defendant and used "et al." to reference the other defendants. *See* Compl. at ECF p. 2. Geiger's use of "et al." in the initial complaint technically violated Rule 10 of the Federal Rules of Civil Procedure because he should have named all defendants in the caption **and** body of the

ECF pp. 2, 3–4. Geiger sued each defendant in their official and individual capacities. *See id.* at
ECF p. 4.

As for his factual allegations and asserted causes of action, this court previously
summarized them as follows:

> [O]n June 15, 2019, [Geiger] was in front of his mother's residence talking
> to a friend on his cell phone when he noticed Officer Conroy pull up and park his
> police vehicle. (*Id.* at 5.) Geiger put his cell phone away, got on his bicycle, and
> drove past Conroy who stated that "he wanted to stop [Geiger] for motor vehicle
> code violation because [Geiger] was traveling [westbound] on bicycle." (*Id.*)
> Geiger rode to "23rd Dickinson then went in route southbound traveling to Tasker
> Street." (*Id.*) Geiger rode on the sidewalk "to avoid cars" until he encountered
> Officer Mawson, who was also on a bicycle. (*Id.*) Mawson "scream[ed] stop stop
> [sic]" and Geiger stopped his bike. (*Id.*) Mawson ran his bike into Geiger, causing
> Geiger to hit the ground, and Geiger alleges he was "attacked by officers" while he
> was on the ground. (*Id.*) Specifically, Geiger asserts that Officer Alexander
> McChord ("A. McChord") kicked him while he was on the ground even though he
> was not resisting arrest. (*Id.*) Geiger avers that his face was bruised and bloodied as
> a result of the incident, and he has since developed a scar near his right eye. (*Id.* at
> 5–6.)
>
> Geiger was handcuffed by A. McChord and "pushed" towards the police
> vehicle. (*Id.* at 6.) Officer Santiago conducted a pat down search of Geiger which
> revealed cocaine, $585 in cash, and Geiger's cell phone. (*Id.*) Geiger was escorted
> to a hospital before he was transported to the police station, placed in a holding cell,
> and charged with possession of narcotics. (*Id.*) Geiger asserts that he was
> questioned by Detectives Troccoli and Gallagher "who [made] up a fake story"
> about having "a doorbell camera" depicting Geiger on the street "handling a
> firearm." (*Id.*) Geiger was subsequently shown pictures taken on June 15, 2019 that
> depicted a firearm found on the inside of a bulldozer wheel. (*Id.* at 7.) Geiger's
> remaining allegations identify multiple instances of what he contends are acts of
> police misconduct, including assertions that the pictures taken were "switched with
> another crime scene," "the police tampered with evidence and changed the scene,"

---

complaint. *See* Fed. R. Civ. P. 10(a) ("Every pleading must have a caption with the court's name, a title, a file number,
and a Rule 7(a) designation. **The title of the complaint must name all the parties**[.]" (emphasis added)); *see also
Allen v. Nat'l R.R. Passenger Corp.*, Civ. A. No. 03-CV-3497, 2004 WL 2830629, at *3 (E.D. Pa. Dec. 7, 2004) ("The
designation of 'et al' in a complaint's caption, without an identification of the proper parties in the body of the
complaint, does not satisfy the Rule 10(a) identification requirement." (citations omitted)). However, in pleadings
filed **after** the original complaint, "after naming the first party on each side, [the pleading] may refer generally to other
parties." *Id.* In other words, if Geiger filed an amended complaint and did not name any new defendants, he could list
one defendant in the caption of the amended complaint and use "et al." to refer to the other defendants. Despite this
technical violation, as Geiger is proceeding *pro se* and at least listed all defendants in the body of the complaint, the
court did not require him to file an amended complaint in which he listed all defendants in the caption as well.

and "fake pictures" were entered into evidence because the date and time stamp of the pictures do not match. (*Id.* at 8.)

Based on these allegations, Geiger alleges that the Defendants have violated his Fourth, Sixth, Eighth, and Fourteenth Amendment rights. (*Id.* at 9-11.) Geiger asserts that the Defendants lacked probable cause, illegally obtained, concealed, and/or fabricated evidence, witnessed and failed to correct the continuation of police misconduct, and maliciously prosecuted him, causing him pain and suffering, emotional distress, and deliberate indifference. (*Id.*) Geiger also avers that Defendants Mawson and A. McChord used excessive force against him in violation of his Fourth Amendment rights. (*Id.* at 9, 12.) Geiger contends that his Sixth and Fourteenth Amendment due process rights were violated because there is no complainant or witnesses to the events in question. (*Id.* at 12.) He asserts that his Eighth Amendment rights were violated because he "has no bail." (*Id.*) Finally, Geiger asserts that falsifying evidence is a "deliberate indifference" violation, depriving him of due process guaranteed by the Constitution. (*Id.*) Geiger seeks "declaratory and injunctive relief" including release from the custody of the police and PICC. (*Id.* at 13-14.) He also seeks compensatory damages, punitive damages, and costs. (*Id.* at 14.)

Sept. 29, 2022 Mem. Op. at 3–4, Doc. No. 7.

After screening these allegations and reviewing the IFP Application under 28 U.S.C. § 1915, the court entered a memorandum opinion and order granting the IFP Application and dismissing (with and without prejudice) certain claims from the complaint. *See* Doc. Nos. 7, 8. The court dismissed without prejudice Geiger's (1) official capacity claims against all defendants, (2) section 1983 malicious prosecution claims, and (3) claims seeking release from prison.[6] *See* Sept. 29, 2022 Mem. Op. at 6–10; Sept. 29, 2022 Order at ECF p. 2, Doc. No. 8. In addition, the court dismissed with prejudice Geiger's (1) claims of "criminal concealment" in violation of 18 U.S.C. § 2071 and (2) claims seeking a declaration that the defendants violated his constitutional

---

[6] In dismissing without prejudice Geiger's official-capacity claims, the court noted that Geiger failed to allege "a specific custom or policy by which official capacity claims may be maintained" and "any policy or custom of the City [which] caused the constitutional violations he describes in his [c]omplaint" as required by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Sept. 29, 2022 Mem. Op. at 6–7. Regarding Geiger's malicious prosecution claims, the court dismissed them because he failed to allege that his criminal proceedings were terminated in his favor as required by *Heck v. Humphrey*, 512 U.S. 477 (1994). *See id.* at 8–9. As for his claims seeking release from incarceration, the court dismissed them because he needed to file a habeas petition (and not a section 1983 action) if he sought his release from incarceration. *See id.* at 9–10 (citations omitted).

rights.[7] *See* Sept. 29, 2022 Mem. Op. at 9, 10–11; Sept. 29, 2022 Order at ECF p. 2. The court also

stayed and abstained from hearing, pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), any of

Geiger's claims under the Fourth, Sixth, Eighth, and Fourteenth Amendments based on allegations

that the defendants have illegally obtained, concealed, or fabricated evidence.[8] *See* Sept. 29, 2022

Mem. Op. at 11–13; Sept. 29, 2022 Order at ECF pp. 2–3. In the end, the only claims which passed

statutory screening were Geiger's excessive force claims under the Fourth Amendment against

Officers Mawson and A. McChord. *See* Sept. 29, 2022 Mem. Op. at 7–8; Sept. 29, 2022 Order at

ECF p. 2. As such, the court directed the clerk of court to issue summonses for the two defendant

officers and transmit those summonses and copies of the complaint to the United States Marshals

for service. *See* Sept. 29, 2022 Order at ECF p. 3.

While the Marshals were attempting to serve the two defendants, Geiger filed a motion for

leave to file an amended complaint on October 27, 2022. *See* Doc. No. 11. In the motion, Geiger

sought "leave to file an amended complaint adding partys [sic], . . . MORE ADDED AND

Different Facts, [and] . . . ADDING A NEW legal claim." Mot. for Leave to File an Am. Compl.

at ECF p. 1, Doc. No. 11. He also appeared to seek to add multiple public defenders as defendants.

*See id.* Although Geiger evidenced this desire to amend his complaint, he never explained what

claims he sought to assert, the factual allegations supporting those claims, or even all the

defendants against whom he sought to assert claims. *See id.* He also failed to attach a proposed

amended complaint. *See id.* Due to these failures, the court denied the motion for leave to file an

---

[7] In dismissing Geiger's criminal concealment claims, the court explained that criminal statutes could not provide a basis for civil liability. *See* Sept. 29, 2022 Mem. Op. at 9 (citations omitted). Concerning his declaratory judgment claims, the court dismissed them because, *inter alia*, "[d]eclaratory relief is unavailable to adjudicate past conduct." *Id.* at 10 (citations omitted).

[8] The court indicated that the stay would be lifted once Geiger informed the court that his criminal proceedings had concluded and filed a motion seeking to reassert those claims. *See* Sept. 29, 2022 Mem. Op. at 13; Sept. 29, 2022 Order at ECF p. 2.

amended complaint without prejudice to Geiger to refile it if he also provided the necessary allegations and claims in a proposed amended complaint. *See* Doc. No. 12.

On November 3, 2022, the Marshals filed two documents relating to their attempts to serve Officers Mawson and A. McChord. *See* Doc. Nos. 12, 13. The first document showed proof of service on Officer Mawson. *See* Doc. No. 12. The second document was an affidavit of no-service for Officer A. McChord. *See* Doc. No. 13. In this affidavit of non-service, there are remarks indicating that the Marshals were unable to serve Officer A. McChord because the City's Legal Department could not locate his name on an alphabetical roster of City employees. *See id.* The Marshals also indicated that "[a]dditional information [was] needed for identification." *Id.* It does not appear that Geiger ever provided the Marshals with the additional information they needed to locate Officer A. McChord. As such, there is no proof of service on him to date.

Officer Mawson, the only remaining, served defendant against whom Geiger had an active claim, filed an answer and affirmative defenses to the complaint on December 1, 2022. *See* Doc. No. 15. Almost three weeks later, on December 21, 2022, Geiger filed three documents: (1) a "Declaration for Entry of Default," where he appeared to seek to have the clerk of court enter default against Officer A. McChord based on a manufactured belief that the Marshals had served him, and he had failed to timely respond to the complaint; (2) a motion to appoint counsel; and (3) a proposed amended complaint. *See* Doc. Nos. 16–18.[9]

On December 29, 2022, the clerk of court docketed a motion for leave to file an amended complaint and, seemingly, another proposed amended complaint from Geiger. *See* Doc. Nos. 19, 20. On January 11, 2023, Officer Mawson filed a response to the motion for leave to amend in which he indicated he was not opposed to Geiger filing an amended complaint. *See* Doc. No. 21.

---

[9] Although these documents were marked as filed on December 21, 2022, they were not entered on the docket until December 29, 2022.

On January 19, 2023, Geiger filed a document that he appears to want to add as an exhibit to his proposed amended complaint. *See* Doc. No. 22. On March 7, 2023, Geiger filed a copy of a letter he may have sent to the Center for Constitutional Rights in New York, where he appears to assert that the City's police are setting him up, and if the Center agrees represent him in his case against them and hires a private investigator, he will give them $25 million of the $50 million he anticipates winning in this case. *See* Doc. No. 23.

## II.   DISCUSSION

As indicated above, the current posture of this case is that this court has abstained from entertaining certain of Geiger's claims relating to his ongoing criminal prosecution pursuant to *Younger* abstention and has stayed those claims pending resolution of his criminal case; his Fourth Amendment excessive force claims against Officers Mawson and A. McChord passed statutory screening under section 1915(e)(2); Officer Mawson has filed an answer and affirmative defenses to the complaint; the Marshals have been unable to effect service on Officer A. McChord because the City's Law Department is asserting that there is no employee with that name in the City's employee roster; Geiger has taken no steps to assist the Marshals with serving Officer A. McChord; Geiger has filed a request for the entry of default against Officer A. McChord despite the lack of service of the summons and original complaint on him; Geiger has filed a motion for appointment of counsel, a motion for leave to file an amended complaint (which Officer Mawson does not oppose), two documents Geiger has titled as complaints, and a separately filed exhibit. Considering this current posture, the court will first address Geiger's unopposed request to amend his complaint because the court's resolution of that motion and the reasons for that resolution will affect other aspects of this case. The court will then address Geiger's request for entry of default against Officer A. McChord and his motion for appointment of counsel.

### A.     Geiger's Motion for Leave to file an Amended Complaint

#### 1.     Standard of Review

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, the court may, in its discretion, deny leave to amend if "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Forrester v. Solebury Twp.*, Civ. A. No. 20-4319, 2021 WL 662290, at *5 (E.D. Pa. Feb. 19, 2021) (quoting *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003), *as amended* (Jan. 20, 2004)). Amendment would be futile where "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Id.* (quoting *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007)). In determining whether amendment would be futile, the court applies "the same legal standard it employs when deciding a motion for dismissal pursuant to [Rule] 12(b)(6)." *Sunoco, Inc. v. Praxair, Inc.*, Civ. A. No. 01-1475, 2001 WL 438419, at *1 (E.D. Pa. Apr. 30, 2001) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1435 (3d Cir. 1997)).

A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). "In ruling on a 12(b)(6) motion, courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of actual allegations." *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 735 (3d Cir. 2004) (citation and internal quotation marks omitted). Ultimately, a complaint must contain facts sufficient to nudge any claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Additionally, as Geiger is proceeding *pro se*, the court must liberally construe the allegations set forth in the proposed amended complaint in analyzing whether it fails to state a plausible claim for relief. *See Higgs v. Attorney Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Nevertheless, "pro se litigants must allege sufficient facts in their complaints to support a claim[;] . . .they must still serve process on the correct defendants[; and] they cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## 2.    Analysis

As a preliminary matter, it is unclear to the court which of the two amended complaints (neither of which are titled as amended complaints) Geiger seeks leave to file in this matter. *See* Doc. Nos. 18, 20. The first-docketed potential amended complaint, Doc. No. 18, is significantly

longer than the other potential amended complaint, *compare* Doc. No. 18 (47 pages in length), *with* Doc. No. 20 (9 pages in length), and, while the first-docketed potential amended complaint barely complies with the Federal Rules of Civil Procedure for reasons the court will discuss later in this opinion, it is organized much more like an amended complaint than the latter-docketed possible amended complaint. More specifically, it at least identifies the named defendants and includes a much more robust recitation of the factual allegations and asserted legal claims. In addition, it does not appear that the latter-docketed potential amended complaint contains any allegations or legal claims that are not already included in the first-docketed potential amended complaint. As such, the court has interpreted Geiger's motion for leave to file an amended complaint as relating to the amended complaint docketed at Doc. No. 18 (hereinafter referred to as the "Proposed Amended Complaint").

The court has thoroughly reviewed the Proposed Amended Complaint and will first attempt to identify the factual allegations and legal claims the court understands Geiger to be asserting. Then, the court will address these legal claims and explain why the court must deny Geiger leave to amend with respect to most of his legal claims, will allow him to amend certain of those claims, and will stay the claims the court is allowing Geiger to amend.

 a. <u>Allegations and Legal Claims in the Proposed Amended Complaint</u>

In the Proposed Amended Complaint, Geiger names 15 defendants. *See* Am. Compl. at ECF p. 2, Doc. No. 18. Among those defendants are eight of the nine originally named defendants: Officer Conroy; Officer Mawson; Police Officer Catherine McChord ("Officer C. McChord");[10]

---

[10] Geiger changed the spelling of this defendant's first name from Katherine to Catherine. The court has used this latter spelling when referencing this defendant throughout the remainder of this memorandum opinion.

Officer A. McChord; Officer Santiago; Detective Gallagher;[11] Lt. Metellus; and Detective Hall.[12] *See id.* Geiger also names several new defendants, including: (1) "P/O Commissioner of Police John Doe #1" (the "Commissioner"); (2) City Police Detective Cavalieri ("Detective Cavalieri"); (3) Philadelphia County Court of Common Pleas[13] Judge Donna Woelpper; (4) City Public Defender Grisham Cooney ("PD Cooney"); (5) City Public Defender Keith Hadsell ("PD Hadsell"); (6) City Public Defender Kevin Yao ("PD Yao"); and (7) an unknown City Public Defender (identified as John Doe #2) ("Unknown PD"). *See id.* Geiger indicates that he is suing each of these defendants in their individual and official capacities. *See id.*

Geiger starts his Proposed Amended Complaint with a description of what occurred on June 15, 2019, as the events of that day precipitated all that has occurred here. *See id.* at ECF p. 5. Essentially, Geiger alleges that he was lawfully standing in front of a residence located at the intersection of 22nd and Dickinson Streets in Philadelphia when he noticed that a police vehicle parked across the street from this residence.[14] *See id.* At around this time, Geiger "got on [his] bike to avoid any potential danger that might have been taking place due to [the police officer's] sudden arrival." *Id.*

Geiger started biking away from the residence, and he passed Officer Conroy while he was holding onto the handlebars of his bike with one hand and placing his cell phone in his back pocket with the other. *See id.* Although Geiger was not paying attention to Officer Conroy after he passed him, apparently Officer Conroy had exited and reentered the police vehicle, and then drove away.

---

[11] It appears that Geiger corrected the spelling of this defendant's last name, as he spelled it "Gallogher" in the original complaint.

[12] The only defendant named in the original complaint who Geiger did not include in the Proposed Amended Complaint is "Detective Badge # 665."

[13] Geiger mistakenly alleges that Judge Woelpper is a Philadelphia Municipal Court Judge, *see* Am. Compl. at ECF p. 2, even though she is a Philadelphia County Court of Common Pleas Judge.

[14] While it is somewhat unclear, but it appears that Geiger alleges that Officer Conroy was in this police vehicle. *See* Am. Compl. at ECF p. 5.

*See id.* Geiger claims that Officer Conroy did not tell him to stop the bike at that time.[15] *See id.* at ECF pp. 5, 12. In addition, Geiger alleges that Officer Conroy "was in uniform that was not suited for his job duty" insofar as he was not wearing his hat and did not turn on his body camera. *See id.* at ECF p. 12.

Geiger claims that he was traveling to a 7-Eleven located on 23rd and Passyunk Streets when he noticed Officer Mawson. *See id.* at ECF p. 5. Officer Mawson yelled to Geiger to stop, but Geiger did not stop his bike because he was not sure that Officer Mawson was talking to him. *See id.* Geiger continued to travel on his bike until Officer Mawson, who apparently was on his own bike, slammed his bike into the front wheel of Geiger's bike. *See id.* This collision caused Geiger to fall and "face plant[]" on the ground. *See id.*

Upon Geiger falling to the ground, Officer Mawson grabbed Geiger's shirt, dragged him, and forced him to the ground. *See id.* As Geiger attempted to "get [his] barring [sic]," he noticed Officers A. McChord and C. McChord appear and approach him. *See id.* At this point, Officer Mawson started kicking and punching him, and then other unidentified officers joined in the "attack." *Id.* The "attack" went on for a "few minutes," until Officer McChord[16] pulled Geiger's

---

[15] Geiger appears to contend, in a rambling, frivolous recitation of unrelated law that is a customary practice of the sovereign citizen movement, that Officer Conroy did not have a "contract" with him (although the poorly worded sentence could also be read as Officer Conroy lacked a contract with himself) which would require Geiger to stop if Officer Conroy directed him to do so. *See* Am. Compl. at ECF p. 12 ("Plaintiff is aware of Mr. Conroy Defendant [sic] did not give a verbal contract to officer"). This court has attempted to, as best as possible, ignore Geiger's "nonsensical language and legalisms often found in pleadings filed by adherents to the so-called sovereign citizen movement," *Mouratidis v. Wolf*, Civ. A. No. 22-CV-4628, 2023 WL 2025035, at *1 n.2 (E.D. Pa. Feb. 15, 2023), and focus on any factual allegations he has included in the Proposed Amended Complaint. As such, the court is ignoring Geiger's "nonsensical language and legalisms," such as this argument as to why he should not have been charged with a crime in the first place:

> How can I as the plaintiff be charged with an alleged crime as a human being, but yet has an armband that represents an artificial person name written in all capital-letters is [sic] a corporation this [sic] is semantic deceit a repugnant [sic] fraudulent unconstitutional act that brings chicanery to the Philadelphia County lower courts.

Am. Compl. at ECF p. 12.
[16] Geiger does not specify which Officer McChord—Officer A. McChord or Officer C. McChord—he is referring to here.

hand upward while also placing his foot on Geiger's face. *Id.* Geiger claims that he was not resisting arrest. *See id.*

Eventually, officers handcuffed Geiger and pulled him off the ground. *See id.* Officer Santiago, who had also arrived at the scene, then searched Geiger's pockets. *See id.* During this search, Officer Santiago located (1) "79 small cans," which Geiger had purchased for "medicinal recreational purposes only," in Geiger's front right pocket; (2) $585 in Geiger's front left pocket; and (3) a cell phone from Geiger's back pocket. *See id.* After the search, Officer A. McChord placed Geiger in a police van and Geiger was then transported to the hospital for treatment.[17] *See id.* After receiving treatment, Geiger was transported to the "First District" police station where he was searched and fingerprinted. *See id.*

After his intake, Detectives Gallagher and Troccoli interviewed Geiger. *See id.* at ECF p. 6. During the interview, the detectives informed Geiger that they were informed by a citizen that Geiger had tossed a firearm, and they had footage of Geiger holding a firearm. *See id.* Geiger denied possessing a firearm. *See id.* Geiger also asked to review the footage of him holding the firearm, but the detectives refused his request. *See id.* The detectives also refused Geiger's request that they produce the citizen who reported that he tossed a firearm, and they declined to answer his question about whether they received a radio call about him possessing the firearm.[18] *See id.* At this point, Geiger terminated the interview, and he was returned to his holding cell. *See id.*

Approximately 20 minutes after returning to his cell, Detective Troccoli[19] asked Geiger if he could take an "illegal" DNA swab, but Geiger refused. *See id.* Later, Detective Cavalieri approached Geiger's cell and told him that it did not matter whether he agreed to the DNA test

---

[17] Geiger claims that he was "not treated properly" at the hospital. *See* Compl. at ECF p. 5.
[18] Geiger claims that he had a right at that time to see the footage, have the complaining witness appear before him, and to have the police answer the question about the radio call. *See* Compl. at ECF p. 6.
[19] Detective Troccoli is not a named defendant in the Proposed Amended Complaint.

because they would test his DNA from a hat Geiger was wearing at the time of his arrest, which they had recovered. *See id.* Geiger responded that his DNA was already in the CODIS system due to a prior arrest. *See id.*

On June 17, 2019, Geiger was arraigned on drug and firearm charges. *See id.* His bail was set at $300,000, and a detainer was lodged by a parole officer.[20] *See id.* Geiger was then transported to the Curran-Fromhold Correctional Facility in Philadelphia, where he apparently was placed in quarantine for safety precautions. *See id.*

On June 21, 2019, PD Unknown, an unnamed attorney from the Defender Association of Philadelphia, was assigned to Geiger. *See id.* Geiger alleges that this public defender provided him with photographs which showed a firearm placed in the wheel of a bulldozer. *See id.* After reading a report (presumably a police report), PD Unknown allegedly told Geiger that he would be "released for reasons of a cover up," explained to him why he could not have thrown the gun to the location shown in the photographs, and told him that the government would be unable to prove constructive possession. *Id.* at ECF pp. 6–7.

In early July 2019, Geiger was transported to a "proceeding" before Philadelphia Municipal Court Judge Jacquelyn Frazier-Lyde.[21] *See id.* at ECF p. 7. Geiger asserts that "due to his status as

---

[20] Geiger does not explain why a detainer was lodged.

[21] Geiger did not specifically identify the type of "proceeding" which occurred before Judge Frazier-Lyde. *See* Am. Compl. at ECF p. 7. Nevertheless, after referencing this proceeding before Judge Frazier-Lyde, Geiger next describes in the Proposed Amended Complaint an event which occurred "after [his] preliminary hearing." *Id.* Therefore, it appears that Judge Frazier-Lyde presided over Geiger's preliminary hearing. This supposition is at least somewhat supported by the Unified Judicial System of Pennsylvania's publicly accessible docket for Geiger's criminal charges while they were before the municipal court, as it indicates that Judge Frazier-Lyde "held [over Geiger's charges] for court" on July 2, 2019. *See* Docket, *Commonwealth v. Lamont Geiger*, No. MC-51-CR-15961-2019 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0004718-2019&dnh=keXfNlXbCSkMD3QyssoYJw%3D%3D (last visited March 16, 2023); *Commonwealth v. Sills*, 352 A.2d 539, 543 (Pa. Super. 1975) (explaining that phrase "held for court" "describe[s] the determination made by the 'issuing authority' when the Commonwealth has presented a prima facie case against the accused" and pointing out that references to this term in the Pennsylvania Rules of Criminal Procedure "is used only in the context of preliminary hearings"). This court may consider these docket entries because a district court may consider matters of public record "when . . . screening . . . a *pro se* complaint under [28 U.S.C.] § 1915." *Castro-Mota v. Smithson*, Civ. A. No. 20-CV-940, 2020 WL 3104775, at *1 n.3 (E.D. Pa. June 11, 2020) (citing *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256,

a sovereign citizen," he was compelled to have another attorney, Assistant Public Defender Brian Johnson, represent him for this hearing. *See id.* Although it is very much unclear what occurred during the hearing, Geiger appears to allege that Officer Mawson was not present for it. *See id.* ("Officer Donald Mawson was not present for hearing [sic] because his testimony would have [r]evealed Officer[s A. McChord and C. McChord] conflict [sic] with his statement and would get [Geiger] released.").

At some point after the preliminary hearing, Geiger alleges that he was visited by Assistant Public Defender Tara Schiraldi ("PD Schiraldi").[22] *See id.* During PD Schiraldi's visit, she indicated to Geiger that she had two possible plea deals for him: one that was for 9 to 18 years' incarceration; the other that was for 6 to 12 years' incarceration. *See id.* Geiger claims to have declined both deals. *See id.* Geiger also avers that PD Schiraldi asked him whether he wanted to see the "the information about the case." *Id.* While it is somewhat unclear, it appears Geiger told her that he wanted to see this "information." *See id.* ("[S]he asked do I want the information about case [sic] I told her that after I find out what they are using against [me] I will return papers."). PD Schiraldi presented Geiger with a form to sign, which he may or may not have signed because of his sovereign citizen beliefs. *See id.* ("Tara asked me to sign a form which I do not sign any right to power of attorney[.]"). Geiger claims that he received "a copy of incomplete discovery" insofar as it was allegedly missing six photographs and lab results from the DNA taken from his hat. *Id.*

---

260 (3d Cir. 2006)); *see Wesley v. Varano*, Civ. A. No. 1:12-CV-1131, 2012 WL 2813827, at *1 (M.D. Pa. July 10, 2012) ("In disposing of a 12(b)(6) motion, in addition to the complaint, courts may consider matters of public record, orders, exhibits attached to the complaint, and items appearing in the record of the case; hence, a court also may consider these items in screening a complaint under the provisions of 28 U.S.C. § 1915." (citations omitted)); *see also Donahue v. Dauphin Cnty.*, Civ. A. No. 1:17-cv-1084, 2017 WL 3405112, at *1 n.1 (M.D. Pa. June 27, 2017) ("This publicly available state criminal docket, available online . . ., is a public record of which the Court may take judicial notice in considering dismissal for failure to state a claim." (citations omitted)); *Pearson v. Krasley*, Civ. A. No. 16-66, 2017 WL 2021061, at *1 (E.D. Pa. May 11, 2017) ("A court may also consider public records such as criminal dockets" when analyzing whether complaint fails to state claim for relief under Rule 12(b)(6)).
[22] PD Schiraldi is not named as a defendant in this action.

He also appears to assert that the discovery revealed that neither his fingerprints nor his DNA was found on the recovered firearm. *See id.*

Presumably on a date after this visit by PD Schiraldi, Geiger alleges that he received a visit by another assistant public defender assigned to him, PD Cooney. *See id.* Geiger alleges that PD Cooney told Geiger that he was his attorney and informed him that his DNA results "came back negative." *Id.* Geiger asked PD Cooney for a copy of the DNA results, but PD Cooney told him that the results were unimportant and did not need to be shared with him. *See id.* At this point, Geiger claims to have "verbally fired" PD Cooney. *See id.*

Geiger then alleges that although he had been called at an unidentified date and time for a hearing before Judge Woelpper, the hearing was continued and he had to be transported back to jail. *See id.* While he was waiting in a holding cell to be transferred, a sheriff approached him and informed him that detectives were there to speak with him. *See id.* At this point Detectives Cavalieri and Troccoli approached Geiger even though they lacked a warrant or a court order. *See id.* They then began "harassing" Geiger and allegedly attempted to obtain his DNA so they could place it on a firearm because they knew the recovered firearm lacked his DNA on it. *See id.* Geiger avers that the sheriff told the detectives that they had to leave because they were "illegally" in Geiger's location. *See id.* Geiger also claims that a subpoena should be issued to inspect a logbook at "CJC,"[23] seemingly because CJC requires individuals there to register their firearms, and it would show that these detectives visited him and attempted to illegally place his DNA on the recovered firearm. *See id.*

---

[23] The court has interpreted this acronym as Geiger's reference to the Philadelphia Criminal Justice Center, where some of the Philadelphia Municipal Court Judges are located.

On May 26, 2020, Geiger's then-defense counsel (presumably, PD Cooney) was removed, and the court assigned another attorney to represent him.[24] *See id.* It appears that this new attorney was PD Hadsell. *See id.* at ECF p. 8. Geiger alleges that when PD Hadsell first visited him at PICC, he brought "fake pictures" to show him. *See id.* These fake pictures allegedly showed a firearm that had moved to a new location outside of the bulldozer. *See id.*

Geiger asked to inspect these photographs on January 7, 2021, and he asserts that they show that the defendants "went back to [the] scene and made all new pictures rearranged [sic] and made a new scene." [25] *Id.* He claims that after taking the new photographs, the defendants went to the public defenders' office and switched the photographs. *See id.* It appears that Geiger is alleging that PD Hadsell is part of a conspiracy with the "defendants" to switch the photographs. *See id.* Although Geiger complained about PD Hadsell to a supervisor, no action was taken in response to Geiger's report of alleged misconduct. *See id.* Geiger then filed a disciplinary complaint with the Disciplinary Board of the Supreme Court of Pennsylvania and the "Bar Association." [26] *Id.*

After PD Hadsell's representation of Geiger concluded, Geiger claims that PD Yao became his new defense attorney. *See id.* Geiger identifies several complaints he has with PD Yao's representation of him. *See id.* Geiger complains that PD Yao (1) filed a motion to suppress and a motion for release under Pennsylvania Rule of Criminal Procedure 600[27] without first showing the

---

[24] The publicly available docket for Geiger's criminal case in the Philadelphia County Court of Common Pleas reflects that Geiger filed a motion for removal of counsel which was docketed on May 26, 2020; however, is unclear from the docket entries if the trial court granted Geiger's motion for new counsel or appointed new counsel to represent him in the case. *See* Docket, *Commonwealth v. Geiger*, No. CP-51-CR-4718-2019 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0004718-2019&dnh=keXfNlXbCSkMD3QyssoYJw%3D%3D ("C.P. Docket") (last visited March 16, 2023).

[25] Geiger does not identify the specific defendants who allegedly manipulated these photographs and the crime scene. *See* Am. Compl. at ECF p. 8.

[26] Geiger states that he will be filing a class action lawsuit. *See* Am. Compl. at ECF p. 8. He also asserts that after "these acts were committed," PD Hadsell "was fired and a new attorney was hired." *Id.* The court notes that the Disciplinary Board of the Supreme Court of Pennsylvania's attorney database shows PD Hadsell is still working for the Defender Association of Philadelphia. *See* https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/323074 (last visited March 16, 2023).

[27] Rule 600 is Pennsylvania's speedy trial rule. *See* Pa. R. Crim. P. 600.

motions to Geiger and getting his approval; (2) refused to "file [Geiger's] Affidavit of Reservation of Rights UCC-1-308/1-207 and [his] Affidavit of Rebuttal with courts because [he] is not under contract with [the] courts"; (3) responded to Geiger's request to subpoena PD Unknown by stating that (a) PD Unknown was "not allowed to help [Geiger] out at court [because] she is [sic] a conflict of interest" and (b) she left the country and no longer works for the Defender Association of Philadelphia; (4) did not assist Geiger with obtaining footage from a video camera that Geiger claims was monitoring the street corner where he was arrested; and (5) "used threats" to keep Geiger from "reporting" information about the information PD Unknown told him, even though Geiger acknowledges that any threat did not stop him from reporting the information anyway. *Id.*

Regarding the unconsented-to motion to suppress and Rule 600 motion, Judge Woelpper had scheduled a hearing regarding those motions, and PD Yao allegedly told Geiger that he should not speak at this hearing. *See id.* The hearing occurred on February 12, 2021, and Geiger alleges that during the hearing Judge Woelpper asked him whether he was having problems with PD Yao.[28] *See id.* Geiger informed Judge Woelpper that he believed PD Yao to be ineffective, and he asked to be able to represent himself. *See id.* Geiger claims that Judge Woelpper granted his request and allowed Geiger to represent himself with PD Yao serving as standby counsel.[29] *See id.*

By early May 2021, Geiger apparently had new counsel appointed for him. *See id.* at ECF p. 9. Soon thereafter, his new defense counsel, named Gary Sandford, visited Geiger at PICC. *See id.* At that time, it appears Geiger claims that he was missing certain pieces of discovery, including photographs, test results, and body camera footage. *See id.* Geiger was also unsuccessful in

---

[28] At another point in the Proposed Amended Complaint, Geiger appears to allege that the motion to suppress hearing occurred on December 2, 2021. *See* Am. Compl. at ECF p. 21.
[29] The docket reflects that Judge Woelpper denied the motion to suppress on February 12, 2021. *See* C.P. Docket. However, it does not contain any reference to Geiger's counsel until May 3, 2021, when it appears that Judge Woelpper appointed new counsel to represent Geiger. *See id.*

attempting to acquire footage from any cameras in police vehicles that could have viewed what happened before and during his arrest. *See id.* Geiger asserts that during his visit with Attorney Sandford, he had a corrections officer inspect the discovery, and there was still "no footage of chase [sic] [or] 911 call for the dispatch." *Id.*

Geiger alleges that on approximately June 24, 2021, Detectives Gallagher and Cavalieri visited him at PICC "for a DNA Harassment Speach [sic]" that they performed on him. *See id.* Although the detectives appear to have shown Geiger a court order which authorized them to take his DNA, Geiger claims that this was a fake court order, and the detectives were using subterfuge to obtain his DNA so they could place his DNA on the recovered firearm. *See id.* Geiger asserts that he asked the detectives to read the order, and they showed it to him. *See id.* While reviewing the order, Geiger noticed that the order was not signed by Judge Woelpper, and he believes that this rendered the order "fake." *See id.* Geiger also asked the detectives for a copy of the fake order, but they did not give him a copy. *See id.* It is unclear from Geiger's allegations whether the detectives obtained his DNA during this visit. *See id.*

In mid-July 2021, Geiger filed a motion to subpoena "camera for production of pictures also hat results" because the police were not disclosing this information to him. *See id.* at ECF p. 14. He believes this sought-after information will show that the pictures are fake. *See id.*

On May 9, 2022, Geiger received "his day in court" before Judge Woelpper. *Id.* at ECF p. 11. When the court asked Geiger to state his name for the record, he proceeded to follow the sovereign citizen playbook by stating on the record that "the 'accused' is actually the legal personality which is the name on the birth certificate," because he believes that when someone asks for a person's name, "they are talking to the legal personality (the strawman) and not to the

human."[30] *Id.* Although Geiger expressed that his "name [was] not required in any proceedings used in statutory law," the court apparently, but unsurprisingly, did not accept Geiger's position on why he could not state his name. *Id.* Geiger then asked the court for all the information relating to his charges, but his request was denied. *See id.* Geiger also asked the court to "assert its jurisdiction," but Judge Woelpper "denied jurisdiction because she is absent in jurisdiction." *Id.* Geiger informed Judge Woelpper that he has exhausted all his state remedies and would be filing a section 2254 habeas petition soon. *See id.* Judge Woelpper replied to Geiger's threat of filing a habeas petition by stating, "[W]ell[,] you do that sir," and then Geiger was escorted out of the courtroom and returned to a holding cell pending his transfer back to PICC. *See id.*

Apparently, Geiger once again was appointed a new defense attorney, Leon Goodman, Esq. ("PD Goodman"), who conducted a video visit with Geiger where they went over Geiger's case. *See id.* at ECF p. 9. During this conversation, Geiger informed PD Goodman about the conspiracy being perpetuated by the defendants, and explained they did a "bad job on [sic] trying to set [him] up." *Id.*

---

[30] The Third Circuit Court of Appeals has explained sovereign citizens' use of a "strawman" as follows:

> [V]arious publications . . . advocat[ed] the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms. One instruction book, Cracking the Code, calls for the use of commercial law to resist authority, including the correctional and judicial systems. The book adheres to the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." The "strawman" purportedly came into being when the United States went off the gold standard in 1993, and, instead, pledged the strawman of its citizens as collateral for the country's national debt. Redemptionists claim that government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody. If government officials refuse, inmates are encouraged to file liens against correctional officers and other prison officials in order to extort their release from prison. Adherents of this scheme also advocate that inmates copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

*Monroe v. Beard*, 536 F.3d 198, 203 n.4 (3d Cir. 2008) (citations omitted).

On September 30, 2022, Geiger participated in a "brief hearing" before a new judge at the CJC.[31] *See id.* at ECF p. 10. Geiger asserts that Judge Woelpper had not previously informed PD Goodman that he would be acting as "co-counsel," so PD Goodman was confused about his role during the hearing.[32] *Id.* Geiger also asserts that he was brought into the courtroom "for an unknown reason," and he had previously "made [the] courts very aware [that he was] representing himself and [would be] filling [sic] the 2254 writ of habeas corpus." *Id.* While in the courtroom, Geiger indicates that PD Goodman asked Geiger to state his name for the record, and Geiger responded by stating:

> I plead sovereign immunity as affirmative [sic] defense under Rules [sic] 8, under the United States Republic's constitutional system of government and upon the individuality and intelligence of the citizen. The state does not claim to control one's conduct to others, leaving one the sole judge as to all that affects oneself.
>
> . . . Where rights secured by the Constitution are involved, there can be no rule-making or legislation, which would abrogate them.
>
> . . . The claim and exercise of constitutional rights cannot be converted into a crime.
>
> . . . For a crime to exist, there must be an injured party (corpus delicti). There can be no sanction or penalty imposed on one because of this constitutional right.

*Id.*

After Geiger's response, the clerk stated that he had refused to be sworn in and tried asking him to state his name again. *See id.* Geiger responded by stating that "the 'accused' is actually the legal personality which is the name on . . . ."[33] *Id.* At this point, Geiger claims to have been pushed

---

[31] Geiger alleges that he received information on or around the time of this hearing that his DNA "test didn't pop up as an individual that performed a test for a firearm charge that [he] pleaded guilty to and was sentenced to 11 1/2 to 23 months . . . [in] 2005." Am. Compl. at ECF p. 11. Although it is unclear what Geiger is stating here, he later states that his "CODIS number is not a match with [the] results for [the] gun." *Id.*

[32] It is unclear whether Geiger is stating that PD Goodman did not know that he would be assisting Geiger as standby counsel or if there was also another attorney representing Geiger at that proceeding.

[33] Geiger asserts that he has attempted to get transcripts of his pretrial proceedings in May 2022 and September 30, 2022, so that he could put forward a challenge to the jurisdiction of the officers who arrested him. *See* Am. Compl. at ECF p. 10. He has not received a response, and contends he is "being ignored," which is "a violation of [his] lawful right." *Id.*

out of the courtroom and threatened by the judge to have his court date pushed back a year, even though Geiger believes that he was simply exercising his First Amendment right of free speech. *See id.* Geiger was later transported back to PICC, where he refused to submit to a psychological examination ordered by the judge. *See id.*

Geiger claims that "Defendant" had a private investigator working for "his office" examine Geiger's case. *See id.* at ECF p. 11. Geiger alleges that this investigation showed that the officers in his case "commit[ed] illegal conduct" by tampering with the firearm found at the scene and falsely reporting that Geiger threw it. *See id.* The investigation also indicated that the firearm had been placed on the bulldozer by someone other than Geiger, which was evidenced by the lack of (1) scratches on the sides of the firearm, (2) residue from concrete or the bulldozer visible on the "front end" or handle of the firearm, and (3) "any residue at all from a firearm that was reported to have been thrown." *See id.* Geiger indicates that this informed necessitates that the private investigator be subpoenaed. *See id.*

Based on these factual allegations, the court understands Geiger to be asserting the following claims: (1) section 1983 claims for excessive force used during his arrest in violation of the Fourth Amendment; (2) a section 1983 claim for failure to intervene when excessive force was used during his arrest in violation of the Fourth Amendment; (3) section 1983 claims for false arrest and false imprisonment in violation of the Fourth Amendment; (4) section 1983 claims for malicious prosecution in violation of the Fourth Amendment; (5) section 1983 claims for fabrication of evidence in violation of the Due Process Clause of the Fourteenth Amendment; (6) section 1983 claims for perjury; (7) section 1983 claims against some of his assigned defense counsel; (8) section 1983 claims against Judge Woelpper; (9) section 1983 claim for deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment; (10) section

1983 supervisory liability claims; (11) section 1983 claims for illegal seizures in violation of the

Fourth Amendment; (12) section 1983 and 42 U.S.C. § 1985(3) conspiracy claims; (13) section

1983 official capacity claims; and (14) a section 1983 claim based on a violation of a criminal

statute. The court will now review each of these purported causes of action.[34]

---

[34] Although the court is not denying the entirety of Geiger's motion for leave to amend on this basis, the Proposed Amended Complaint comes very close to not complying with Rule 8 of the Federal Rules of Civil Procedure. As already stated, Rule 8(a) requires a complaint to contain, *inter alia*, "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a proposed amended complaint does not comply with Rule 8, a district court may deny the motion seeking leave to file it. *See Garrett v. Wexford Health*, 938 F.3d 69, 91 (3d Cir. 2019) (explaining district court's ability to dismiss complaint for violating Rule 8); *Rosado v. Dugan*, Civ. A. No. 19-5068, 2022 WL 19257, at *3 (E.D. Pa. Jan. 3, 2022) ("Courts can deny leave to amend if the proposed amended pleading violates Rule 8." (citations omitted)); *see also Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (explaining that district court may *sua sponte* dismiss complaint that does not comply with Rule 8 if "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised").

In determining whether a pleading meets Rule 8's "plain" statement requirement, the court should "ask whether, liberally construed, [the] pleading 'identified discrete defendants and the actions taken by these defendants' in regard to the plaintiff's claims." *Garrett*, 938 F.3d at 93 (citation omitted). A pleading may still satisfy the "plain" statement requirement "even if it is vague, repetitious, or contains extraneous information" and "even if it does not include every name, date, and location of the incidents at issue." *Id.* at 93–94. In addition, "[m]issing details or superfluous material do not necessarily render a complaint unintelligible. Indeed, even if it is vague, repetitious, or contains extraneous information, a pro se complaint's language will ordinarily be 'plain' if it presents cognizable legal claims to which a defendant can respond on the merits." *Id.* at 94 (citations omitted). Thus, the important consideration for the court is whether "a pro se complaint's language . . . presents cognizable legal claims to which a defendant can respond on the merits." *Id.*

Nonetheless, "a pleading that is so 'vague or ambiguous' that a defendant cannot reasonably be expected to respond to it will not satisfy Rule 8." *Id.* at 93; *see also Fabian v. St. Mary's Med. Ctr.*, No. CIV. A. 16-4741, 2017 WL 3494219, at *3 (E.D. Pa. Aug. 11, 2017) (stating that Rule 8 "requires that pleadings provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue" (quotations omitted)). Dismissals under Rule 8 are "'reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" *Garrett*, 938 F.3d at 94 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).

Here, the court's review of the Proposed Amended Complaint is hindered by Geiger's references to the misguided and baseless legal beliefs of individuals participating in the sovereign citizen movement. There are pages and large portions of other pages of the Proposed Amended Complaint devoted to Geiger reciting these frivolous legal beliefs. They do not help him in prosecuting his cause here; instead, they inhibit review of the Proposed Amended Complaint.

The court admonishes Geiger against relying on his sovereign citizen beliefs to prosecute this case because, as already stated, **every** court to be confronted with "the type of nonsensical language and legalisms . . . found in pleadings filed by adherents to the so-called sovereign citizen movement" has found them to be frivolous as a matter of law. *Mouratidis*, 2023 WL 2025035, at *1 n.2; *see In re Johnson*, Civ. A. No. 22-CV-5258, 2023 WL 1784747, at *2 (E.D. Pa. Feb. 6, 2023) ("'[L]egal-sounding but meaningless verbiage commonly used by adherents to the so-called sovereign citizen movement' has been rejected by courts throughout the country as legally frivolous." (quoting *United States v. Wunder*, Civ. A. No. 16-9452 (ES) (MAH), 2019 WL 2928842, at *5 (D.N.J. July 8, 2019))); *Banks v. Florida*, No. 2:19-cv-756-FtM-38NPM, 2019 WL 7546620, at *1 (M.D. Fla. Dec. 17, 2019) (explaining that "the arguments and legal theories espoused by sovereign citizens have been consistently rejected as 'utterly frivolous, patently ludicrous, and a waste of . . . the court's time, which is being paid by hard-earned tax dollars'" (quoting *Young v. PNC Bank, N.A.*, No. 3:16cv298/RV/EMT, 2018 WL 1251920, at *2 (M.D. Fla. Mar. 12, 2018))), *report and recommendation adopted*, 2020 WL 108983 (M.D. Fla. Jan. 9, 2020); *Sealey v. Branch Banking and Trust Co.*, Civ. No. 2:17cv785-MHT-SMD, 2019 WL 1434065, at *2 (M.D. Ala. Feb. 21, 2019) (noting that *pro se* plaintiff's "filings

b.      Review of Geiger's Claims

i.      *Section 1983 Excessive Force Claims*

The court understands Geiger to be asserting excessive force claims against Officers

Mawson, A. McChord, and C. McChord based on their conduct when arresting him on June 15,

2019.[35] A section 1983 plaintiff's claim that "law enforcement officials used excessive force in

the course of making an arrest, investigatory stop, or other 'seizure' of [the plaintiff] . . . are

properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*

*v. Connor*, 490 U.S. 386, 388 (1989). The operative question in these excessive force cases is

"whether the totality of the circumstances justified a particular sort of search or seizure," e.g., a

use of force.[36] *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). The court analyzes this question "from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"

making "allowance for the fact that police officers are often forced to make split-second

---

here are replete with the legal-sounding but meaningless verbiage commonly used by adherents to the so-called sovereign-citizen movement"); *see also Washam v. Superintendent Dallas SCI*, No. 21-3073, 2022 WL 1402054, at *1 (3d Cir. May 4, 2022) (per curiam) (referencing documents filed by *pro se* plaintiff "consisting largely of frivolous Sovereign-Citizen-like arguments and legal jargon that was by turns inapposite and indecipherable"). As such, this court has also excluded any sovereign-citizen-like arguments as supporting any recognized causes of action in the Proposed Amended Complaint or creating a cause of action that the court must review.

Another aspect of the Proposed Amended Complaint creating difficulty for the court in reviewing the Proposed Amended Complaint is the large portions where Geiger is attempting to show that certain defendants committed perjury. *See, e.g.*, Am. Compl. at ECF pp. 17–18, 21–22. In these sections, Geiger appears to combine his own comments about the testimony with the purported testimony, without identifying in which proceeding(s) the testimony is located.

Despite these issues, Geiger provides just enough information in other parts of the Proposed Amended Complaint for the court to identify the named defendants and the apparent claims against them. As such, the court will not deny the motion for leave to amend based solely on Geiger's failure to comply with Rule 8(a).

[35] In his original complaint, Geiger only asserted excessive force claims against Officers Mawson and A. McChord. *See* Compl. at ECF pp. 5–6.

[36] The "totality of the circumstances" could include any myriad of factors, including, but not limited to (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether [the suspect] actively is resisting arrest or attempting to evade arrest by flight," (4) "the physical injury to the [suspect]," (5) "the possibility that the persons subject to the police action are themselves violent or dangerous," (6) "whether the action takes place in the context of effecting an arrest," (7) "the possibility that the suspect may be armed," and (8) "the number of persons with whom the police officers must contend at one time." *Jefferson v. Lias*¸ 21 F.4th 74, 79 (3d Cir. 2021) (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004); *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020)).

26

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Because this inquiry is so fact-dependent, "[t]he reasonableness of the use of force is normally an issue for the jury." *Jefferson*, 21 F.4th at 79 (quoting *Rivas*, 365 F.3d at 198).

Here, while Geiger has pleaded sufficient factual allegations against Officers Mawson, A. McChord, and C. McChord to support excessive force claims against them under the Fourth Amendment, he cannot proceed on those claims because they are plainly barred by the applicable statute of limitations. Although the statute of limitations is ordinarily an affirmative defense, a district court may dismiss claims based on an affirmative defense if the affirmative defense is obvious from the face of the operative complaint. *See Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) ("A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint."); *Whitenight v. Cmwlth. of Pa. State Police*, 674 F. App'x 142, 144 (3d Cir. 2017) (per curiam) ("When screening a complaint under § 1915, a district court may *sua sponte* dismiss the complaint as untimely under the statute of limitations where the defense is obvious from the complaint and no development of the factual record is required." (citations omitted)); *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988) (affirming district court's denial of leave to amend where proposed amended complaint would not survive renewed motion for judgment on pleadings because it would be barred by statute of limitations).

The court recognizes that Geiger's excessive force claims against Officers Mawson and A. McChord were previously permitted to proceed past statutory screening and that these claims were based on the same factual predicate as his claims against Officers Mawson, A. McChord, and C. McChord in the Proposed Amended Complaint. The court also did not address the statute of

limitations issue. Nevertheless, section 1915(e)(2) provides that "the court shall dismiss the case ***at any time*** if the court determines that . . . the action . . . (i) is frivolous or malicious; [or] fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2). This court improvidently permitted Geiger's excessive force claims in his original complaint to pass statutory screening, and the court will not allow Geiger to prosecute those claims via an amended complaint. The court will also vacate the prior order allowing those claims to proceed to service and will now dismiss those claims with prejudice.

Geiger's section 1983 claims, including his Fourth Amendment excessive force claims, are subject to the applicable state's statute of limitations for personal injury actions. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (concluding that statute of limitations for section 1983 actions "is governed by the personal injury tort law of the state where the cause of action arose"). Since Geiger's claims arose in Pennsylvania, the court applies Pennsylvania's relevant limitations period, which is two years. *See Wisniewski*, 857 F.3d at 157 (stating that "[t]he statute of limitations applicable to § 1983 claims in Pennsylvania is two years" (citation omitted)). This two-year limitations period accrues "when a plaintiff has a complete and present cause of action, that is, when [the plaintiff] can file suit and obtain relief." *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (quotation marks and citation omitted). This means that the statute of limitations generally "accrues when the plaintiff knew or should have known of the injury upon which [the] action is based." *Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998).

In certain circumstances, Pennsylvania's discovery rule may operate to delay the running of the statute of limitations. *See Nicolaou v. Martin*, 195 A.3d 880, 892 (Pa. 2018) ("[T]he

discovery rule tolls the statute of limitations where the plaintiff is reasonably unaware that he has been injured and that his injury has been caused by another party's conduct."). In other words,

> [w]here the plaintiff's injury or its cause was neither known nor reasonably ascertainable, [Pennsylvania's] discovery rule tolls the statute of limitations . . . . The statute of limitations accordingly begins to run when the plaintiff knew or, exercising reasonable diligence, should have known (1) he or she was injured and (2) that the injury was caused by another. That reasonable diligence standard is an objective one, but at the same time sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question.

*Adams v. Zimmer*, 943 F.3d 159, 163–64 (3d Cir. 2019) (internal quotation marks and citations omitted). Whether or not Pennsylvania's discovery rule applies in a case is a question of fact that the factfinder must resolve, *see id.* ("[T]he question '[w]hether [a plaintiff] should have acted with greater diligence to investigate' or otherwise should have known of her injury earlier 'can only be seen as an issue of fact.'" (quoting *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011))), unless "reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of [the party's] injury and its cause[,]" which would allow the court to determine that "the discovery rule does not apply as a matter of law." *Fine v. Checcio*, 870 A.2d 850, 858–59 (Pa. 2005) (citation omitted).

In general, "[e]xcessive force claims typically accrue on the date of the alleged assault because, at that point, 'the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action.'" *Sorokaput v. Fare*, No. 21-2188, 2022 WL 3043154, at *1 (3d Cir. Aug. 2, 2022) (per curiam) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998)). In addition, "a pending criminal charge does not delay accrual of an excessive force claim arising out of an arrest for that charge." *Morrill v. City of Denton*, 693 F. App'x 304, 307 (5th Cir. 2017) (citations omitted). Here, there is no allegation in the Proposed Amended Complaint (or in the original complaint) that Geiger was not aware that he was injured when Officers Mawson, A.

McChord, and C. McChord allegedly assaulted him on June 15, 2019. *See, e.g.*, Compl. at ECF p. 6 (alleging that he had "a bruised face" and his "right eye has a scar"); Am. Compl. at ECF p. 32 ("[T]he harm that the police caused by excessive force was a month [sic] worth of discomfort in my face area[.] I had to use hot water treatment to my facial area also my hands was [sic] bruised for a week from breakin [sic] fall. I could not sleep for a week[.] My face had caused my neck to get cramps because I had to sleep on my jumpsuit cause [sic] my face was in pain[.] I got a few Tylenol and I had no other treatment[.] My mental health was slowly givin [sic] way because I had to deal with the pain with out [sic] medical attention that was in need. My mental health was failing because when you come to jail u [sic] dont [sic] get treatment[.] It is not available u [sic] have to be off medical hold first."). As such, reasonable minds would not differ in finding that Geiger knew or should have known upon the exercise of reasonable diligence the injuries he suffered from the defendant officers' alleged use of excessive force against him on June 15, 2019.

Since it is obvious from both the face of the Proposed Amended Complaint and the original complaint that Geiger's claims for excessive force against Officers Mawson, A. McChord, and C. McChord accrued in June 2019, and Geiger did not file a complaint in this case (which also did not include an excessive force claim against Officer C. McChord) until June 2022, the statute of limitations bars these Fourth Amendment excessive force claims.[37] Therefore, the court will (1) deny Geiger's request to amend his complaint to assert excessive force claims against Officers Mawson, A. McChord, and C. McChord, (2) vacate the portion of the September 29, 2022 memorandum opinion and order which permitted the identical causes of action against Officers

---

[37] The court notes that a conviction for resisting arrest does not always bar a plaintiff from recovering damages on a section 1983 claim for excessive force. *See Garrison v. Porch*, 376 F. App'x 274, 277–78 (3d Cir. 2010) (concluding that favorable termination rule in *Heck v. Humphrey*, 512 U.S. 477 (1994) does not necessarily exclude section 1983 excessive force claim where plaintiff was convicted of resisting arrest (citing *Nelson v. Jashurek*, 109 F.3d 142, 145–46 (3d Cir. 1997)).

Mawson and A. McChord to proceed past screening, and (3) will dismiss the claims for excessive force against Officers Mawson and A. McChord with prejudice. *See Ong v. Hudson Cnty. Superior Ct., N.J. Law Div. Admin. Office*, 760 F. App'x 133, 135–36 (3d Cir. 2018) (per curiam) (affirming district court's dismissal of plaintiffs' section 1983 excessive force claims based on altercation with sheriff's officers in courthouse in May 2012 where complaint was filed in October 2016, "well after the [two-year] limitations period expired" and where "they have offered no basis to toll the statute of limitations"); *Whitenight*, 674 F. App'x at 144 (affirming district court's dismissal of *pro se* plaintiff section 1983 excessive force claim arising out of arrest where incident forming basis of claim occurred in December 2013, plaintiff did not file complaint until four months after expiration of applicable statute of limitations, and allegations in amended complaint showed that plaintiff "was aware of injuries when he was arrested"); *Talbert v. City of Philadelphia*, Civ. A. No. 21-4303, 2021 WL 4552390, at *6 (E.D. Pa. Oct. 5, 2021) (concluding that *pro se* plaintiff's section 1983 claim for excessive force was facially time-barred because plaintiff alleged that assault by police sergeant occurred in January 2019, and he did not file complaint until more than two years later).

        ii.    *Section 1983 Claim for Failure to Intervene*

It appears that Geiger tries to assert a failure to intervene claim against Officer Mawson for not stopping the other officers' use of excessive force while effecting his arrest in June 2019. *See* Am. Compl. at ECF p. 28 ("The action s of Defendants [sic] Donald Mawson #1323 to protect Plaintiff from partner beating not [sic] stoping [sic] beating . . . ."). In general,

> "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under § 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *accord Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). However, an officer is only liable if there is a realistic and reasonable opportunity to intervene. *See Clark*, 783 F.2d at 1007

31

> (instructing the district court upon remand to determine whether the officer was in
> a position to intervene); *Brishke*, 466 F.2d at 11 (liability for failure to intervene
> exists only if the beating occurred in the officer's presence or was otherwise within
> his knowledge); *Putman*, 639 F.2d at 423–24 (liability exists only if the non-
> intervening officer saw the beating or had time to reach the offending officer).

*Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002).

Although Geiger may have plausibly pleaded, albeit inconsistently in terms of asserting that Officer Mawson was not only assaulting him but also failing to stop any other officers from doing so, a failure to intervene claim, this claim suffers from the same fatal flaw as his section 1983 excessive force claims, namely, it is barred by the applicable statute of limitations. *See, e.g.*, *Farrow v. City of Philadelphia*, Civ. A. No. 20-5792, 2021 WL 2778554, at *2 (E.D. Pa. July 1, 2021) (explaining that section 1983 claims for "false arrest, false imprisonment and failure to intervene . . . accrued when [plaintiff] was arrested on November 19, 2018" and were barred by statute of limitations when complaint filed more than two years after accrual date). As such, the court will deny Geiger's request to amend his complaint to assert a cause of action under section 1983 for failure to intervene against Officer Mawson.

###### iii.    *Section 1983 Claims for False Arrest and False Imprisonment*

The court understands Geiger to be attempting to assert causes of action under section 1983 for false arrest and false imprisonment seemingly against Officers Mawson, A. McChord, and C. McChord.[38] To the extent that Geiger asserted such claims in the original complaint against any defendant, the court had abstained from hearing those claims pursuant to *Younger* and stayed those claims until the underlying criminal case concludes. *See* Sept. 29, 2022 Mem. Op. at 11–13. As the court pointed out in the prior memorandum opinion:

> If a plaintiff files a false-arrest claim before he has been convicted (or files any
> other claim related to rulings that will likely be made in a pending or anticipated

---

[38] To the extent that Geiger intended for any other named defendants to be included in this cause of action, the court's resolution of his request to add these claims would be the same.

criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended.

*Id.* at 13 (quoting *Wallace*, 549 U.S. at 393–94). If Geiger "is ultimately convicted," and if this stayed suit "would impugn that conviction, *Heck* will require dismissal; otherwise, th[is] civil action will proceed, absent some other bar to suit." *Wallace*, 549 U.S. at 394 (citing *Edwards v. Balisok*, 520 U.S. 641, 649 (1997) and *Heck*, 512 U.S. at 487).

Here, there is nothing alleged in the Proposed Amended Complaint that would cause this court to not continue to abstain from addressing any false arrest or false imprisonment claims until Geiger's criminal case has concluded. Accordingly, although the court will permit Geiger leave to amend his complaint to fully set forth his claims for false arrest and false imprisonment, the court will stay those claims pending the conclusion of Geiger's criminal case.[39]

iv.  *Section 1983 Malicious Prosecution Claims*

The court understands Geiger to be again seeking to assert section 1983 claims for malicious prosecution, even though the court had previously dismissed those claims without

---

[39] As stated above, this court abstained from hearing any false arrest claims (and any other claims that could operate to impugn or interfere with Geiger's criminal proceedings) pursuant to *Younger* abstention. *See* Sept. 29, 2022 Mem. Op. at 11-13. Interestingly, when the Supreme Court first talked about abstention possibly being the appropriate response to when "a state criminal defendant brings a federal civil-rights lawsuit during the pendency of [their] criminal trial, appeal, or state habeas action," the Court cited to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) instead of *Younger*. *See Heck*, 512 U.S. at 487 n.8.

The court also notes that the statute of limitations for section 1983 false arrest and false imprisonment claims generally accrues "when a plaintiff 'appear[s] before the examining magistrate and [is] bound over for trial,' i.e., 'once the victim becomes held pursuant to [legal] process[.]'" *Geness v. Cox*, 902 F.3d 344, 354–55 (3d Cir. 2018) (quoting *Wallace*, 549 U.S. at 391, 393)); *see Wallace*, 549 U.S. at 390, 397 (concluding that (1) statute of limitations for section 1983 false imprisonment claim begins to run "when legal process [is] initiated against [the plaintiff]" and (2) "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process"); *Voglino v. Shapiro*, Civ. A. No. 3:21-565, 2021 WL 6072751, at *4 (M.D. Pa. Dec. 23, 2021) ("The statute of limitations for a false arrest claim runs from the date of the arrest because the claim can be filed as soon as the alleged unlawful arrest occurs." (citing *Wallace*, 549 U.S. at 388–89)). As indicated above, Geiger alleges that he was arrested and arraigned in June 2019, and he had his preliminary hearing in early July 2019. *See* Am. Compl. at ECF pp. 6–7. Therefore, should the stay of Geiger's false imprisonment and false arrest claims be lifted, he may have a significant limitations issue with these claims.

prejudice based on *Heck*'s favorable termination rule.[40] *See* Sept. 29, 2022 Mem. Op. at 8–9; Sept. 29, 2022 Order at ECF p. 2. *Heck*'s favorable termination rule provides that

> to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. at 486–87 (footnote and citation omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)). "Thus, when a [plaintiff] seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487.

Geiger has not included any new factual allegations in his Proposed Amended Complaint which would cause this court to alter its prior determination that his section 1983 malicious prosecution claims are properly dismissed without prejudice based on *Heck*. Geiger has not alleged that his criminal proceedings have concluded, much less alleged that they terminated in his favor. As such, the court will not permit him to amend his complaint to assert section 1983 malicious prosecution claims based on his ongoing criminal prosecution. *See McDonough v. Smith*, 139 S.

---

[40] As with Geiger's section 1983 false arrest and false imprisonment claims, it is unclear which defendants are a part of his section 1983 malicious prosecution claims. Nevertheless, like with those false arrest and false imprisonment claims, it does not matter against which defendants Geiger is attempting to assert malicious prosecution claims because he cannot bring them at this time against any defendant.

Ct. 2149, 2160 (2019) ("*Heck* explains why favorable termination is both relevant and required for a claim analogous to malicious prosecution that would impugn a conviction, and that rationale extends to an ongoing prosecution as well: The alternative would impermissibly risk parallel litigation and conflicting judgments.").

> v.    *Non-Conspiracy Section 1983 Claims for Fabrication of Evidence*

Geiger alleges that law enforcement officers fabricated evidence by altering the scene where the firearm he is alleged to have possessed and tossed was located, and by taking new photographs of that crime scene showing the firearm in this different location. *See, e.g.*, Am. Compl. at ECF p. 8 (alleging issue with new photographs allegedly showing that firearm moved). In general, a fabrication-of-evidence claim under section 1983 implicates the Due Process Clause of the Fourteenth Amendment. *See Black v. Montgomery Cnty.*, 835 F.3d 358, 370 (3d Cir. 2016) ("Fabricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking function of the trial process.'" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) ("[W]e hold that if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted.").[41] This claim is a stand-alone section 1983 claim and does not need to be a part of a malicious prosecution claim. *See Halsey*, 750 F.3d at 293 ("[W]e reject the contention that there cannot be a stand-alone Fourteenth Amendment claim predicated on the fabrication of evidence."). However, as with malicious

---

[41] "[A] conviction [is not] a prerequisite to a stand-alone due process claim against a state actor for fabrication of evidence." *Black*, 835 F.3d at 370.

prosecution claims, a plaintiff cannot "bring [their] fabricated-evidence claim under § 1983 prior

to favorable termination of his prosecution." *McDonough*, 139 S. Ct. at 2156.

Here, as the court explained while discussing Geiger's malicious prosecution claims, he

may not maintain his fabrication-of-evidence claims at this time because he has not, and cannot,

allege that his criminal proceedings have resolved in his favor. Accordingly, the court will not

permit Geiger to amend his complaint to include any section 1983 fabrication-of-evidence claims

at this time.[42]

vi.     *Section 1983 Claims for Perjury*

The court understands Geiger to be attempting to assert section 1983 claims for perjury

against several of the defendant officers based on their testimony at his preliminary hearing and

possibly at another hearing on PD Yao's motion to suppress and Rule 600 motion. *See, e.g.*, Am.

Comp. at ECF pp. 15, 17, 19, 21. To the extent that Geiger is attempting to plead such claims, the

court will not grant him leave to amend these claims because the defendant officers have absolute

immunity for any testimony they provided during those pretrial proceedings. *See Briscoe v. LaHue*,

460 U.S. 325, 326, 341–46 (1983) (concluding that convicted plaintiff may not assert claim for

---

[42] The Third Circuit's stand-alone fabrication-of-evidence claim requires a plaintiff to show that "there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." *Id.* at 371. The Third Circuit's "reasonable likelihood" causation standard "requires that a plaintiff draw a 'meaningful connection' between [their] particular due process injury and the use of fabricated evidence against [them]." *Id.* (quoting *Halsey*, 750 F.3d at 294 n.19). In addition,

> [a]side from the causation requirement, there are other hurdles facing a plaintiff alleging a due process violation for fabrication of evidence. For instance, . . . a . . . plaintiff[] . . . [must] demonstrate that the fabricated evidence "was so significant that it could have affected the outcome of the criminal case." *See Halsey*, 750 F.3d at 295. In addition, there is a notable bar for evidence to be considered "fabricated." . . . "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Id.* There must be "persuasive evidence supporting a conclusion that the proponents of the evidence" are aware that evidence is incorrect or that the evidence is offered in bad faith. *Id.* [As such, "it] will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." *Id.* at 295.

*Black*, 835 F.3d at 372 (footnote omitted).

damages against law enforcement officers for perjury under section 1983 because officers are entitled to absolute immunity based on their testimony); *Williams v. Heptig*, 844 F.2d 138, 143 (3d Cir. 1988) (concluding that witnesses testifying during criminal pretrial proceedings, such as preliminary hearings and suppression hearings, are absolutely immune from suit under section 1983 for testimony provided during those pretrial proceedings); *see also Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) (concluding that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony").

      vii.    *Non-Conspiracy Section 1983 Claims Against Some of His Public Defenders*

As evidenced by the court's summary of the factual allegations in the Proposed Amended Complaint, Geiger alleges that several members of the Defender Association of Philadelphia violated his constitutional rights during their representation of him in his criminal case. Although it appears that Geiger did not like any of his several assigned attorneys and may be currently proceeding *pro se* with standby counsel at this stage of his criminal proceedings, he has only named PD Cooney, PD Hadsell, PD Yao, and PD Unknown as defendants. While the court is unsure about the precise legal claims, other than conspiracy, Geiger is asserting against the named defendants, his factual allegations against each of these defendants are somewhat clearly set out in the Proposed Amended Complaint.

As to PD Cooney, Geiger appears to complain that PD Cooney purportedly informed him that the DNA results, which had come back negative, were unimportant and then refused to provide Geiger with a copy of those results. *See* Am. Compl. at ECF p. 7. Regarding PD Hadsell, Geiger alleges that PD Hadsell showed him "fake" photographs that had the recovered firearm in a different location than where Geiger believes it was originally located. *See id.* at ECF p. 8. Geiger also avers that PD Hadsell was part of a conspiracy with the defendant law enforcement officers

to fabricate evidence. *See id.* Concerning PD Yao, Geiger appears to be upset with him for: (1) filing a motion to suppress and Rule 600 motion without Geiger's consent; (2) refusing to file Geiger's "affidavit of reservation of rights UCC-1-308/1-207 and [his] affidavit of rebuttal with courts because [he is] not under contract with courts [sic]"; (3) directing him not to speak to Judge Woelpper during a hearing, during which Geiger alleges Judge Woelpper allowed him to represent himself and for PD Yao to serve as standby counsel; (4) informing Geiger that PD Unknown no longer works for the Defender Association of Philadelphia, was not permitted to help Geiger, and had a conflict of interest; (5) telling Geiger it was not his job to retrieve footage of a video camera "on 23rd Tasker" for Geiger; and (6) threatened Geiger to keep him "from reporting . . . information" about what PD John Doe #2 told him.[43] *See id.* at ECF pp. 8, 29. Finally, regarding PD Unknown, it appears that Geiger alleges that she and his other defense counsel failed to allow him the "chance to defend himself" and denied him due process. *See id.* at ECF p. 28. Geiger also alleges that PD Unknown  failed to "curb known illegal cover up by police officers." *Id.*

None of these claims against these defense attorneys are plausible because they are not individuals amenable to suit under section 1983. Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. Based on the express language of this statute, a plaintiff attempting to establish a claim under section 1983 must allege and prove that a "person" deprived them of a constitutional right while acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a

---

[43] As already stated, Geiger admits that PD Yao's purported threats did not work as Geiger "refused to withhold info." Am. Compl. at ECF p. 8.

claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").

"[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (footnote omitted); *see Saunders v. BB&T Bank*, No. 20-3234, 2021 WL 1696937, at *4 (3d Cir. Apr. 29, 2021) (per curiam) ("Public defenders do not act under color of state law for purposes of § 1983 when they 'perform[ ] a lawyer's traditional functions as counsel to a defendant in a criminal proceeding.'" (alteration in original)); *Dorn v. Aguilar*, 645 F. App'x 114, 115 (3d Cir. 2016) (per curiam) ("As explained by the District Court, Dorn did not state a claim for relief against his public defender and the public defender's office because neither is a state actor for purposes of § 1983."); *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277 (3d Cir. 1999) ("Attorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court."); *see also Gannaway v. PrimeCare Med., Inc.*, 652 F. App'x 91, 95 (3d Cir. 2016) (per curiam) ("We also conclude that the District Court properly granted summary judgment to the defendants on Gannaway's claims against the Berks County Public Defender's Office and the appointed lawyers who represented him in criminal proceedings." (citing *Polk Cnty.*, 454 U.S. at 325)). Since Geiger has named PD Cooney, PD Hadsell, PD Yao, and PD Unknown as defendants due solely to their involvement representing him in his current criminal case, and they appear to be members of the Defender Association of Philadelphia, they are not state actors subject to liability under section 1983, and Geiger has failed to state a plausible claim against them in the Proposed Amended Complaint.[44]

---

[44] While the court has generally referred to Geiger's defense attorneys as public defenders or members of the Defender Association of Philadelphia throughout this memorandum opinion (as Geiger did in the Proposed Amended

viii.   *Section 1983 Claims Against Judge Woelpper*

While very much unclear due to Geiger's recitation of random legal principles and other sovereign-citizen-like jargon, it appears that he generally asserts that Judge Woelpper violated his due process rights under the Fourteenth Amendment. *See* Am. Compl. at ECF pp. 29–30. Geiger alleges that Judge Woelpper failed to stop the defendant officers from perjuring themselves while testifying in her courtroom. *See id.* at ECF p. 29. He also appears to claim that Judge Woelpper failed to investigate his evidence of the defendant officers tampering with the evidence in his case, despite "knowing that her job is to first inspect all information of 1st instance [sic] to find out is there an injured party, to find out if witnesses are present or did a grand jury indict." *See id.* at ECF pp. 29–30. He further appears to challenge Judge Woelpper's jurisdiction to hear his case. *See id.* at p. 30 ("I Lamont Geiger challenge the courts on jurisdiction and on record stated I will be filling a 2254 writ of habeas corpus."); *id.* at ECF pp. 30–31 (describing frivolous sovereign-citizen legal arguments regarding court's lack of jurisdiction). None of these allegations support a plausible section 1983 claim against Judge Woelpper under any provision of the United States Constitution.

Even if somehow Judge Woelpper's alleged actions constituted a possible constitutional violation, judges, such as Judge Woelpper, are absolutely immune from individual liability in civil actions, including section 1983 actions, for their judicial acts. *See Dennis v. Sparks,* 449 U.S. 24,

---

Complaint), it is unclear whether all the defense attorneys work for the Defender Association of Philadelphia or are assisting Geiger as conflict counsel. Conflict counsel are appointed by a court to represent a criminal defendant financially eligible for public defender services if there is a conflict between the defendant and the public defenders' office (or any public defender working in that office). To the extent that any of the defendant defense attorneys represented Geiger in their role as conflict counsel, the court's conclusion here would also apply to them. *See Newton v. City of Wilmington*, 676 F. App'x 106, 108 (3d Cir. 2017) (per curiam) (concluding that to extent plaintiff's section 1983 claims against all attorneys, including conflict counsel, who represented him in criminal case were not state actors for purposes of section 1983 and that "conclusory allegations of conspiracy [we]re not sufficient to plead a claim that the defense attorneys conspired with any state actors"); *T.R. v. Havens*, 612 F. App'x 83, 89 (3d Cir. 2015) (concluding that section 1983 claim against defense attorney appointed to represent plaintiff as conflict counsel in plaintiff's criminal proceedings was not state actor for purposes of section 1983); *cf. Steward v. Meeker*, 459 F.2d 669, 670 (3d Cir. 1972) (per curiam) (concluding privately retained defense counsel was not acting under color of state law while representing plaintiff in plaintiff's criminal case).

27 (1980). "Judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Both judges of general and limited jurisdiction, including magisterial district judges, are entitled to judicial immunity. *See Figueroa v. Blackburn*, 208 F.3d 435, 441 (3d Cir. 2000) (concluding that magisterial district judges, even though they preside over courts of limited jurisdiction, are entitled to protections of judicial immunity). "Generally[,] . . . 'where a court has some subject matter jurisdiction, there is sufficient justification for immunity purposes.'" *Id.* at 443–44 (quoting *Barnes v. Winchell*, 105 F.3d 1111, 1122 (6th Cir. 1997)).

There are only two circumstances in which a section 1983 plaintiff can overcome judicial immunity: "First, a judge is not immune from liability for nonjudicial actions, *i.e.,* actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12 (citations omitted). With regard to the first exception, an act is taken in a judge's judicial capacity if it is "a function normally performed by a judge." *Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 768 (3d Cir. 2000). As for the second exception, "[g]enerally . . . 'where a court has some subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes." *Figueroa*, 208 F.3d at 443–44 (quoting *Barnes*, 105 F.3d at 1112). In determining whether judicial immunity applies, the court "must decide whether the Complaint set[s] forth allegations that, taken as true, establish that the application of an exception to the doctrine of absolute judicial immunity is above the speculative level." *Kirkland v. DiLeo*, 581 F. App'x 111, 114–15 (3d Cir. 2014) (citing *Twombly*, 550 U.S. at 555).

Since the only information before the court is that the actions taken by Judge Woelpper were normal functions done in her judicial capacity in a case over which she properly exercised

jurisdiction as a Judge of the Philadelphia County Court of Common Pleas, she is absolutely immune from suit.[45] The court therefore will deny Geiger's attempt to assert section 1983 claims against Judge Woelpper in her individual capacity.

        ix.    *Section 1983 Claim for Deliberate Indifference to Serious Medical Needs*

Geiger appears to allege that he did not receive sufficient medical care after he was assaulted during his arrest in June 2019. *See* Am. Compl. at ECF p. 32 (alleging that after being "detained by police officers [Geiger] does [sic] not get the proper medical care they [sic] need this [sic] is constitutional violation this [sic] applies to the deliberate indifference test and determined that by not properly screening prisoners [sic] health problems and poorly administering prisoner health service the police had denied [sic] unreasonably delayed prisoner's access to proper medical care in [sic] a violation of the eighth [sic] Amendment.").[46] The court recognizes that "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636–37 (3d Cir. 1995). If the

---

[45] Geiger's lack-of-jurisdiction arguments are frivolous. "[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code." *Commonwealth v. Bethea*, 828 A.2d 1066, 1074 (Pa. 2003); *see also Commonwealth v. Goldblum*, 447 A.2d 234, 244 (Pa. 1982) ("Subject matter jurisdiction in the trial court exists by virtue of the presentation of prima facie evidence that a criminal act occurred within the jurisdiction of the court."); *Commonwealth v. McNeil*, 665 A.2d 1247, 1251 (Pa. Super. 1995) ("Personal jurisdiction in a criminal matter is secured through the defendant's presence within the territorial jurisdiction of the court."). Also, Geiger does not have some sort of sovereign immunity from criminal prosecution. *See Commonwealth v. Carter*, No. 1009 EDA 2022, 2023 WL 2544885, at *2 (Pa. Super. Mar. 17, 2023) ("Appellant's first two claims are grounded in his belief that he, personally, enjoys sovereign immunity from all criminal prosecution and that the court of common pleas thus lacked jurisdiction over Appellant's person. This claim is frivolous, as Appellant is not a sovereign."); *see also Commonwealth v. McGarry*, 172 A.2d 60, 66 (Pa. Super. 2017) (agreeing that defendant's "sovereign citizen claim[]" that he "is not subject to the laws of the Commonwealth of Pennsylvania" is frivolous, and rejecting challenge to Superior Court's jurisdiction to hear appeal).

[46] Law enforcement officers can be sued under section 1983 for deliberate indifference to medical needs for their own behavior. *See, e.g.*, *Williams v. City of Scranton*, Civ. A. No. 3:10-CV-388, 2013 WL 1339027, at *6 (M.D. Pa. Apr. 1, 2013), *aff'd*, 566 F. App'x 129 (3d Cir. 2014); *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 702 (E.D. Pa. 2011) ("While the overwhelming majority of denial of medical treatment claims occur in the prison context, liability under § 1983 is not constrained solely to prisons that fail to provide inmates with required medical treatment."); *Dayton v. Sapp*, 668 F. Supp. 385, 388 (D. Del. 1987) ("The failure of police officers to provide adequate medical care to a prisoner rises to the level of unconstitutional conduct when there is a 'deliberate indifference to serious medical needs.'" (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976))).

individual is not a convicted prisoner, but merely in police custody (*i.e.*, a pretrial detainee), the right arises under the Fourteenth Amendment instead of the Eighth Amendment. *See Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 581–82 (3d Cir 2003) (stating that claims about denial of medical care brought by pretrial detainees arise under Fourteenth Amendment). However, "the Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protections available to a convicted prisoner[.]" *Id.* at 581 (citation and internal quotation marks omitted). Because those protections are, at a minimum, the same under the Fourteenth and Eighth Amendments, "decisions interpreting the Eighth Amendment serve as 'useful analogies[]'" for cases arising under the Fourteenth Amendment. *Boring v. Kozakiewicz,* 833 F.2d 468, 472 (3d Cir. 1987) (quoting *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1080 (3d Cir. 1976)); *see also Mattern v. City of Sea Isle*, 131 F. Supp. 3d 305, 314 (D.N.J. 2015) (reviewing Fourteenth Amendment "pre-incarceration detention and interrogation" denial of medical care claim "under the standard used to evaluate similar claims brought under the Eighth Amendment"), *aff'd*, 657 F. App'x 134 (3d Cir. 2016).

> In the context of the Eighth Amendment, a plaintiff must

> [f]irst, . . . set forth evidence of an objectively serious medical need. *See Monmouth County Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987). A medical need qualifies as "serious" for purposes of this analysis if, for example, "it is one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Id. . . .* Second, a [defendant] is deliberately indifferent if he or she knows of and disregards an excessive risk to [the plaintiff's] health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Moreover, whether or not a defendant's conduct amounts to "deliberate indifference has been described as a classic issue for the fact finder." *See Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998) (cited by *A.M. ex. rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004)).

*Young v. Kazmerski*, 266 F. App'x 191, 193 (3d Cir. 2008) (per curiam).

With respect to an arrestee, "a police officer [must] . . . provide medical care to an individual who was injured during the course of an arrest when the need 'is so obvious that a reasonably trained officer would recognize the necessity for attention.'" *Bornstad ex rel. Estate of Bornstad v. Honey Brook Twp.*, No. C.A. 03-CV-3822, 2005 WL 2212359, at *19 (E.D. Pa. Sept. 9, 2005), *aff'd sub nom. Bornstad v. Honey Brook Twp.*, 211 F. App'x 118 (3d Cir. 2007).[47] Further, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "Deliberate indifference, therefore, requires obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Id.* at 197 (internal citations and quotation marks omitted).[48]

Here, although Geiger asserts that officers were deliberately indifferent to his serious medical needs, there are two issues with his claims and one significant hurdle he cannot overcome. The first issue is that he has not identified which defendant that was deliberately indifferent to his serious medical needs. *See* Am. Compl. at ECF pp. 5, 32; *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (concluding that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable). The second issue is that Geiger admits that two police officers, "Police Officer #3094 and Police Officer Coffie #1457", who are not named defendants in this action, transported him to a hospital for treatment after his arrest. *See* Am. Compl. at ECF p. 5. Although Geiger complains that he was "not treated properly" while at the

---

[47] The court notes that a *post-hoc* diagnosis cannot be used to prove that the medical condition is "serious" because the diagnosis must occur "*before* the defendant's alleged deliberate indifference[.]" *Mattern*, 657 F. App'x at 139 (quoting *Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) (emphasis in original)).

[48] Although Geiger was detained and not yet incarcerated at the time of the alleged deliberate indifference, examples of "deliberate indifference" in the prisoner context include: "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 198.

hospital before being transported to the police station, taking him to the hospital for whatever happened to him during his arrest, seemingly shortly after his arrest, does not appear to plausibly constitute deliberate indifference without additional information about what the defendant officers did or did not do.

Even without these two issues, the significant hurdle that will prevent Geiger from amending his complaint to include a deliberate indifference claim is the statute of limitations. As already stated, the statute of limitations for Geiger's section 1983 claims is two years. *See Wisniewski*, 857 F.3d at 157 ("The statute of limitations applicable to § 1983 claims in Pennsylvania is two years."). The limitations period for a section 1983 deliberate indifference claim accrues when the plaintiff "knew, or had reason to know, of [their] alleged mistreatment." *Smith v. Mun. of Lycoming Cnty.*, 335 F. App'x 147, 149 (3d Cir. 2009) (per curiam); *see Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013) ("A § 1983 claim to redress a medical injury arising from deliberate indifference to a [plaintiff's] serious medical needs accrues when the plaintiff knows of his physical injury and its cause. The statute of limitations starts to run when the plaintiff discovers his injury and its cause even if the full extent or severity of the injury is not yet known."); *In re Davis*, Civ. A. No. 21-CV-5701, 2022 WL 2052645, at *5 (E.D. Pa. June 7, 2022) ("A claim alleging deliberate indifference to serious medical needs accrues when the plaintiff knows or has reason to know that deliberate indifference is displayed." (citations omitted)). In this case, the allegations in the Proposed Amended Complaint sufficiently demonstrate that Geiger was aware that he was allegedly mistreated on the same day as his arrest. He failed to file a deliberate indifference claim within the two-year limitations period and, as such, the court will not give him leave to amend his complaint to add a section 1983 deliberate indifference claim even if he could

identify the individuals who allegedly were deliberately indifferent or the specific action or inaction forming the basis of his claim.

x.    *Section 1983 Claims for Supervisory Liability*

Among all defendants named in the Proposed Amended Complaint, the only two who appear to have supervisory roles are Detective Gallagher and the Commissioner. *See* Am. Compl. at ECF p. 2. Geiger alleges that the Commissioner and Detective Gallagher failed "to take any actions to curb the know [sic] pattern of police officers that causes private citizens to be denied there [sic] due process which is guaranteed by the Federal Constitution." *Id.* at ECF p. 29. These allegations are wholly insufficient to state a claim for supervisory liability under section 1983.

If a section 1983 plaintiff seeks to hold a supervisor liable for the unconstitutional acts by subordinates, there are two theories of supervisory liability: (1) "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and (2) "[A] supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); *see Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015). Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (per curiam) ("Saisi asserted that some defendants were in charge of agencies that allowed this to

happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005))).

Here, Geiger asserts no plausible factual allegations which would satisfy the second method of attempting to establish supervisory liability, insofar as he does not allege that the Commissioner participated in violating his rights, directed the other defendants to violate them, or had knowledge and acquiesced in the other subordinate defendant officers' violations. At best, Geiger makes conclusory allegations of the Commissioner's involvement in any actions by the other defendants, which are insufficient to state a plausible claim for supervisory liability under section 1983 against the Commissioner.

As for the first method of attempting to establish supervisory liability, Geiger also did not include factual allegations in the Proposed Amended Complaint which would indicate that the Commissioner, with deliberate indifference to the consequences, established or maintained a practice, policy, or custom which violated his constitutional rights. A "policy" arises when a decision-maker possessing final authority issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, a plaintiff must establish that the defendant "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to [the plaintiff's] injury." *Id.* (internal quotation marks and alterations omitted). Regardless of whether a plaintiff is seeking to

impose municipal liability for a policy or a custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see also Bielevicz*, 915 F.2d at 850 (explaining that in both methods to obtain liability under *Monell*, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

> In addition,
>
> > [t]here are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." [*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 417 (1997)] (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice is likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18[.] (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390[ (1989)]); *see also Berg*[ *v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)] (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale*, 318 F.3d at 584 (third alteration in original) (internal footnote omitted).

Beyond the conclusory allegation that the Commissioner failed to take action to stop the purportedly known pattern of City of Philadelphia police officers violating citizens' due process rights,[49] Geiger does not point to any formal policy or standard, or even a custom, which caused a violation of his constitutional rights. As the court explained in dismissing similar supervisory

---

[49] Geiger also makes passing references to racial discrimination or racial profiling in the Proposed Amended Complaint; however, other than his conclusory statements that racial discrimination or racial profiling occurred, he has not included factual allegations of any policy, practice, or custom of racial discrimination or racial profiling.

liability claims Geiger attempted to assert in another section 1983 action he had filed, which was assigned to the undersigned:

> Geiger's conclusory assertions, without more, are insufficient to state plausible claims of supervisory liability. *See Aruanno v. Corzine*, 687 F. App'x 226, 229 (3d Cir. 2017) (per curiam) ("Aruanno's claims that general conditions violated his constitutional rights might be construed as alleging that the supervisors failed to train, supervise, or discipline their subordinates. But Aruanno did not show that the Defendants were aware of the violations alleged in his complaint, either before or after they occurred." (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001))); *Argueta v. U.S. Immigr. and Customs Enf't*, 643 F.3d 60, 74 (3d Cir. 2011) (explaining that "broad allegations regarding the existence of a 'culture of lawlessness'" were essentially conclusory allegations that deserve "little if any weight" in determining whether plaintiff stated plausible claim for relief). Geiger has not alleged facts from which it can plausibly be inferred that any of the supervisory defendants established a policy, practice, or custom that caused his injury. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (explaining that "a complaint must do more than allege the plaintiff's entitlement to relief," rather, "[a] complaint has to 'show' such an entitlement with its facts"); *see also Harris v. Peer*, Civ. No. 20-9461 (RMB-AMD), 2020 WL 7707021, at *2 (D.N.J. Dec. 29, 2020) (finding plaintiff's allegation that warden failed to respond to one prior instance of alleged excessive force by defendant corrections officer insufficient to establish that warden established a custom of permitting excessive force to go unpunished, with deliberate indifference to risk of constitutional violation by subordinate).

*Geiger v. Curry*, Civ. A. No. 21-2244, 2021 WL 4453628, at *7 (E.D. Pa. Sept. 29, 2021). Accordingly, Geiger has failed to state a plausible claim for supervisory liability against the Commissioner.

As for Detective Gallagher, to the extent that Geiger is attempting to claim that this defendant, with deliberate indifference to the consequences, established or maintained a practice, policy, or custom which violated his constitutional rights has failed to state a plausible claim for the same reasons he failed to state a similar claim against the Commissioner: He has not alleged any facts from which it could be plausibly inferred that Detective Gallagher established or maintained a policy, practice, or custom which caused his injury. Nonetheless, this does not end the court's inquiry because, unlike his allegations regarding the Commissioner, Geiger does allege

49

that Detective Gallagher interacted with him on two occasions in his criminal case and, therefore, could be attempting to put forward claims for supervisory liability under the second method for doing so.

The first of Geiger's interactions with Detective Gallagher occurred at the police station after Geiger's arrest. *See* Am. Compl. at ECF p. 6. Geiger alleges that Detectives Gallagher and Troccoli questioned him at the station. *See id.* During this questioning, they informed Geiger that a witness saw him throw a firearm, and they also had video footage of him holding a firearm. *See id.* When Geiger asked to see the video, the detectives denied his request. *See id.* Later, the detectives also denied Geiger's request to produce the witness who saw him toss the firearm. *See id.* The detectives further appear to have not responded to Geiger's request as to whether there was a "radio call about any disturbance." *Id.* Geiger claims that he denied possessing or tossing the firearm, and he also terminated the interview. *See id.*

The second of these interactions occurred in June 2021, when Detectives Gallagher and Cavalieri came to visit Geiger at PICC "for a DNA harassment speach [sic]." *Id.* at ECF p. 9. Geiger claims that the detectives had a fake court order, insofar as it was signed by a judge other than Judge Woelpper, to obtain a DNA sample from him. *See id.* Geiger alleges that the detectives threatened him to let them take the DNA sample, and he asserts that they wanted this sample to plant DNA on the firearm. *See id.* Although the detectives let Geiger read the order, they refused to give him a copy. *See id.* Geiger alleges that due to the refusal to give him a copy of the order, the detectives left. *See id.* It is unclear whether the detectives were able to get a DNA sample from Geiger.

In addition to these two interactions, it appears that Geiger alleges that Detective Gallagher violated his constitutional rights by

> allowing any officer including herself to act to dispose of any evidence to cover up illegal acts of tampering with evidence to go back to a crime scene and engage in falsifying records knowingly and intentionally not [sic] report [sic] this illegal act to her ranking officer immediately even if she is being threatened with bodily injury by her co workers [sic] to contact internal affairs.

*Id.* at ECF p. 27. Geiger believes that this shows that Detective Gallagher failed to protect him.

None of these individual acts by Detective Gallagher rise to the level of a constitutional violation. Regarding Geiger's first interaction with Detective Gallagher, there is no constitutional obligation to produce, shortly after an arrest, the evidence law enforcement possesses that it believes supports probable cause to arrest even if the arrestee requests this information. Although the Sixth Amendment provides an accused with the right "to be confronted with the witnesses against [them]," U.S. Const. amend. VI, "[t]his clause, known as the Confrontation Clause, 'guarantees the defendant a face-to-face meeting with witnesses *appearing before the trier of fact*.'" *United States v. Yates*, 438 F.3d 1307, 1312 (11th Cir. 2006) (emphasis added) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988)). Thus, it does not require the government to provide an accused with evidence supporting the arrest at or near the time of the arrest, and Geiger has failed to state a plausible claim insofar as he alleges that he was entitled to certain evidence during his initial interview with Detectives Gallagher and Troccoli.[50]

---

[50] The absurdity of Geiger's belief that he is entitled to be presented with evidence at the time around his arrest is supported by the Pennsylvania Rules of Criminal Procedure. Following the mandates of *Brady v. Maryland*, 373 U.S. 83 (1963), the Pennsylvania Rules of Criminal Procedure impose a mandatory duty on the government to disclose material information to the defense. *See* Pa. R. Crim. P. 573 (Pretrial Discovery and Inspection). To the extent that a party seeks information that "the other party has refused to disclose," the party seeking the information would have "14 days *after arraignment*" to file a motion seeking the information. Pa. R. Crim. P. 573(A). The arraignment "take[s] place no later than 10 days after the information has been filed." Pa. R. Crim. P. 571(A). And the government does not file the information until a "defendant has been held for court following a preliminary hearing or an indictment." Pa. R. Crim. P. 560(A).

These Rules show that a criminal defendant has no right to compel the government to provide them with material information relating to the defendant's arrest or charges until an arraignment has occurred. Therefore, it is

Concerning the second interaction, it is unclear whether the detectives obtained Geiger's DNA because Geiger does not expressly state that they did in the Proposed Amended Complaint. If they did not obtain Geiger's DNA, it is difficult to identify the precise constitutional claim he is raising here, as it would seem to be an attempted illegal search for which no constitutional claim or violation would lie. If, however, the detectives did obtain Geiger's DNA, he would be attempting to assert a cause of action for an illegal search under the Fourth Amendment. *See Maryland v. King*, 569 U.S. 435, 446 (2013) (explaining that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" under Fourth Amendment). As an illegal search claim would be "related to rulings that will likely be made" in Geiger's criminal case, the court will allow Geiger, if he is claiming that the detectives obtained his DNA, to amend his complaint to include this illegal search claim against Detective Gallagher. The court will also stay this potential claim pending resolution of Geiger's criminal case. *See Wallace*, 549 U.S. at 393; *Gakuba v. O'Brien*, 711 F.3d 751, 753 (7th Cir. 2013) ("Because monetary relief is not available to [the plaintiff] in his defense of criminal charges, . . . and because his claims may become time-barred by the time the state prosecution has concluded, the district court should have stayed rather than dismissed [the plaintiff's] civil-rights claims, including his illegal search claims]."); *see also McClure v. Bethel*, Civ. No. 6:22-6025, 2022 WL 2163833, at *3 (W.D. Ark. Apr. 12, 2022) (staying plaintiff's section 1983 illegal search claims pending conclusion of plaintiff's criminal case), *report and recommendation adopted*, 2022 WL 2161515 (W.D. Ark. June 15, 2022); *Stevenson v. Office of Prosecutor of Monmouth Cnty.*, Civ. A. No. 13-7143 (MAS), 2015 WL 105872, at *6 (D.N.J. Jan. 7, 2015) ("[B]ecause it appears that Plaintiff's remaining

---

possible that a defendant will not acquire any information, outside of possibly receiving a copy of an affidavit of probable cause or criminal complaint relating to their charges until a preliminary hearing is held. Pa. R. Crim. P. 542 (providing for preliminary hearing where defendant may "cross-examine witnesses and inspect physical evidence offered against the defendant").

claims, such as illegal search and seizure, malicious abuse of process, etc., may be the subject of motions or other matters pending in Plaintiff's ongoing criminal proceedings in state court, the Court will stay this federal § 1983 action pending completion of the state criminal case.").

xi.   <i>Section 1983 Claim for Illegal Seizure</i>

Geiger attempts to assert a section 1983 claim for illegal seizure against Officer Santiago for the search he performed shortly after Geiger was arrested in June 2019. *See* Am. Compl. at ECF pp. 5, 29. As just indicated, such a claim would potentially intrude upon Geiger's ongoing criminal proceedings. Accordingly, while the court will permit Geiger to amend his complaint to assert an illegal search claim against Officer Santiago, the court will stay this claim pending the outcome of Geiger's criminal case.

xii.   <i>Section 1983 and 1985 Conspiracy Claims</i>

Throughout the Proposed Amended Complaint, Geiger asserts that all defendants in this case are part of a wide-ranging conspiracy to violate his constitutional rights. *See generally* Am. Compl. at ECF p. 27. In some instances, he pairs certain groups of defendants together for conspiracy purposes, *see, e.g.*, Am. Compl. at ECF p. 8 (claiming PD Hadsell conspired with "Defendants" to change crime scene and take photographs of altered crime scene, which had relocated firearm), and in other instances, he blanketly references all defendants as being part of a conspiracy, *see id.* at ECF p. 28 ("[T]he actions of Defendant's [sic] John Doe, Kelly Gallagher, all named defendants also [sic] Judge Donna Woelpper in denying Plaintiff the rightful law which is the supreme law of the land . . . ."). Thus, it is impossible to identify which defendants Geiger is alleging conspired together, the particular actions of the alleged conspirators, how many conspiracies there were, or even whether there was just one overarching conspiracy in which all defendants allegedly participated and the actions he complains of were overt acts in furtherance of

53

that conspiracy. At bottom, Geiger's conspiracy claims under section 1983 and 1985 are very poorly organized and not particularized.

In addition to the lack of particularization and organization, there are no factual allegations supporting his conspiracy claims that relate to a possibly plausible cause of action. For example, the court can easily discern from the Proposed Amended Complaint that Geiger believes that law enforcement officers altered the crime scene and fabricated evidence, and the basis of this belief is Geiger's claim that he saw photographs which purportedly show the firearm in a different location than the one he saw in a photograph provided by PD Unknown during her visit with Geiger a few days after his informal arraignment. *See id.* at ECF p. 6. Although Geiger repeats this general claim in the other parts of his Proposed Amended Complaint, he does not plead any facts to support his conspiracy claims. Instead, his allegations are conclusory and speculative, and those types of allegations are insufficient to state plausible section 1983 or 1985 conspiracy claims. *See Twombly*, 550 U.S. at 556 ("[A] bare assertion of conspiracy will not suffice" to state a claim); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) ("[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred.").[51]

_____

[51] To plead a plausible section 1983 conspiracy claim, a plaintiff must establish that "two or more conspirators reach[ed] an agreement to deprive [them] of a constitutional right under color of law." *Berrios v. City of Philadelphia*, 96 F. Supp. 3d 523, 534 (E.D. Pa. 2015) (citing *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993)). "Such a conspiracy requires a meeting of the minds." *Id.* (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)). Overall, to plead (and ultimately prove) a section 1983 conspiracy claim, the plaintiff must allege and prove that

(1) there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences; (2) the purpose of the plan was to violate a constitutional right of the plaintiff; (3) an overt act resulted in an actual deprivation of the plaintiff's constitutional rights; and (4) the constitutional violation was the result of an official custom or policy of the municipality.

*Kelleher v. City of Reading*, No. CIV. A. 01-3386, 2002 WL 1067442, at *7 (E.D. Pa. May 29, 2002) (citation omitted). As for conspiracies under section 1985(3), a plaintiff may bring an action for injuries caused by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection

The court recognizes that after screening the initial complaint, the court abstained from addressing Geiger's possible section 1985(3) claims based on *Younger* abstention. *See* Sept. 29, 2022 at 12 n.8. However, after reviewing the Proposed Amended Complaint the court simply cannot allow Geiger to amend his complaint to include section 1983 and 1985(3) civil conspiracies when his supporting allegations and organization in his Proposed Amended Complaint are entirely insufficient to state a plausible claim under either statute. As such, the court will keep the stay in place as to Geiger's conspiracy claims (to the extent there are any) in his original complaint but will deny his motion for leave to amend the complaint because he has failed to state plausible conspiracy claims.

xiii.   <em>Section 1983 Official Capacity Claims</em>

In his Proposed Amended Complaint, Geiger states that he is also attempting to sue each defendant in their official capacities. *See* Am. Compl. at ECF p. 2. As explained below, the court will not permit Geiger to amend his complaint to assert any official capacity claims.

As a preliminary matter, this court dismissed Geiger's official capacity claims against the law enforcement defendants named in the original complaint because he had failed to state a plausible claim for relief against them in the official capacities. *See* Sept. 29, 2022 Mem. Op. at 6–7. This dismissal was without prejudice to Geiger repleading such claims in an amended

---

of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To prevail in such a claim, a plaintiff must plead and prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29 (1983).

complaint. *See id.* at 7. Although Geiger has now attempted to replead those claims, he has once again failed to allege a plausible official capacity claim against any defendant.

In the first instance, Geiger may not maintain official capacity claims against PD Cooney, PD Hadsell, PD Yao, or PD Unknown because, as already explained, they do not act under color of state law and, as such, are not amenable to suit under section 1983. Therefore, the court will not allow Geiger to assert official capacity claims against these defendants.

Concerning Judge Woelpper, the court will not permit Geiger to maintain an official capacity claim against her because the claim would be construed as one against the Commonwealth of Pennsylvania since the Philadelphia Court of Common Pleas is part of Pennsylvania's unified judicial system and shares in the Commonwealth's Eleventh Amendment immunity. *See Green v. Domestic Relations Section Ct. of Com. Pl. Compliance Unit Montgomery Cnty.*, 649 F. App'x 178, 180 (3d Cir. 2016) ("All courts in the unified judicial system are part of the Commonwealth[.]" (citing *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 198 (3d Cir. 2008))); *Bern v. First Judicial Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005) ("The Pennsylvania [C]onstitution envisions a unified state judicial system, of which the Judicial District is an integral component. From a holistic analysis of the Judicial District's relationship with the state, it is undeniable that Pennsylvania is the real party in interest in Benn's suit and would be subjected to both indignity and an impermissible risk of legal liability if the suit were allowed to proceed."); *see also Dutton v. Ct. of Common Pleas of Philadelphia Domestic Rels. Div.*, 215 F. App'x 161, 162 (3d Cir. 2007) (per curiam) (concluding that Philadelphia Court of Common Pleas Domestic Relations Division was "entitled to Eleventh Amendment immunity as a state agency with respect to a federal claim" under section 1983); 42 Pa. C.S. § 301 ("The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the: . . . (4) Courts of

common pleas . . . ."). The Eleventh Amendment bars suits seeking monetary damages against the Commonwealth and its agencies in federal court. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa. C.S. §§ 8521–22; *see also Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (explaining that Pennsylvania has not waived Eleventh Amendment immunity), it and its departments, as well as their officials sued in their official capacities, are immune from suits filed in federal court. Accordingly, Geiger may not amend his complaint to assert an official capacity claim against Judge Woelpper.

Regarding the law enforcement defendants, including Officers Tyler, Mawson, A. McChord, C. McChord, and Santiago; Detectives Gallagher, Cavalieri, and Hall; Lt. Metellus; and the Commissioner, Geiger's official capacity claims against them fail as well. Claims against these municipal employees in their official capacities are indistinguishable from claims against the governmental entity that employs them, here, the City of Philadelphia. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978))). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*

Based on the above, to plausibly assert a claim against the aforementioned defendants in their official capacities, Geiger must include sufficient allegations that would allow for *Monell* liability against the City. *See Thomas v. City of Chester*, Civ. A. No. 15-3955, 2016 WL 1106900, at *2 (E.D. Pa. Mar. 21, 2016) ("A suit for damages against an individual municipal employee in

his or her 'official capacity' is not cognizable unless the requirements of *Monell* are met." (citation omitted)). To assert plausible claims against the City of Philadelphia, Geiger must allege that it has a policy or custom which caused the violation of his constitutional rights. *See Monell*, 436 U.S. at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Mouratidis v. Matthew*, Civ. A. No. 22-CV-4631, 2023 WL 2054275, at *2 (E.D. Pa. Feb. 16, 2023) ("To plead a basis for liability against a municipal entity such as the City of Philadelphia under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights."). Thus, Geiger "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the applicable pleading standard. *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citation omitted).

As the court already discussed when addressing Geiger's possible section 1983 supervisory liability claims against the Commissioner and Detective Gallagher, he has failed to provide sufficient factual allegations showing that the City of Philadelphia had a practice, custom, or policy which caused the violation of his constitutional rights. While Geiger makes passing conclusory and speculative references to racial profiling, covering up evidence, altering crime scenes, not reporting instances of perjury or fabricating evidence, unlawfully attempting to obtain DNA from defendants, and an overall plot to deprive citizens of due process, there are no factual allegations to support these claims. Instead, they are cut out of whole cloth and are entirely insufficient to state a plausible official capacity claim against any of the law enforcement defendants. Accordingly,

the court will not grant Geiger's request to amend his complaint to assert official capacity claims against the law enforcement defendants as well.

> xiv.   *Claim for Violations of Criminal Statutes*

In his original complaint, Geiger attempted to assert claims for criminal concealment, removal, or destruction of records under 18 U.S.C. § 2071. *See* Compl. at ECF pp. 2, 9–11, 14. After screening those claims, the court dismissed them with prejudice because criminal statutes do not provide a basis for civil liability. *See* Sept. 29, 2022 Mem. Op. at 9 (citing *Cent. Bank of Dover, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994) and *Black v. Sciver*, No. 16-841, 2016 WL 4594981, at *4 (E.D. Cal. Sept. 2, 2016)). Seemingly undeterred by the court's dismissal of his prior criminal-statute-based civil cause of action, Geiger is now attempting to assert a civil claim based on a violation of 18 U.S.C. § 241, which criminalizes "[c]onspirac[ies] against rights." 18 U.S.C. § 241.[52] Geiger may not maintain a civil cause of action for an alleged violation of section 241; as such, the court will not permit him to amend his complaint to assert any civil claim based on a purported violation of section 241. *See, e.g.*, *Brayboy v. Pagano*, Civ. A. No. 21-CV-4247, 2022 WL 1173006, at *3 n.5 (E.D. Pa. Apr. 20, 2022) ("Section 241

---

[52] Section 241 states:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured--

> They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 241.

establishes criminal liability for certain deprivations of civil rights and conspiracy to deprive civil rights. However, a plaintiff cannot bring criminal charges against defendants through a private lawsuit, and this section does not give rise to a civil cause of action. Accordingly, to the extent Brayboy asserts claims under § 241 such claims are not plausible and must be dismissed with prejudice pursuant to § 1915(e)(2)(B)(ii) as amendment would be futile." (internal citations omitted)).

### B.   Motion for Appointment of Counsel

Geiger has moved to have the court appoint counsel for him in this matter. *See* Doc. No. 17. He claims that the court should appoint him counsel because, *inter alia* (1) he is proceeding *in forma pauperis*; (2) his imprisonment greatly limits his ability to litigate due to his record of having a learning disability; (3) the issues involved in this case are complex, requiring significant research and investigation; (4) he has limited access to the law library; (5) he has limited knowledge of the law; and (6) any trial in this case would involve conflicting testimony, so having counsel would assist him with presenting evidence and cross-examining witnesses. *See* Mot. for Appointment of Counsel at ECF p. 1, Doc. No. 17. As explained below, the court will deny this motion for appointment of counsel at this time.

Civil litigants do not have a constitutional right to counsel. *See Parham v. Johnson*, 126 F.3d 454, 456 (3d Cir. 1997) ("The Supreme Court has not recognized nor has the court of appeals found a constitutional right to counsel for civil litigants." (citation omitted)). Nevertheless, "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). District courts have "'broad discretion' to determine whether appointment of counsel in a civil case would be appropriate." *Montgomery v. Pinchak*, 294 F.3d 492, 498 (3d Cir. 2002) (quoting *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993)). In making this determination, the court

must "consider as a threshold matter the merits of the plaintiff's claim." *Tabron*, 6 F.3d at 154; *see also Mayer v. Corbett*, 186 F. App'x 262, 264 (3d Cir. 2006) (per curiam) (denying motion for appointment of counsel because appellant "has not made a threshold showing that his appeal has arguable merit in fact and law" (citing *Tabron*)). If the plaintiff passes this initial threshold, the court must analyze these factors: (1) "[t]he plaintiff's ability to present his or her case;" (2) "the difficulty of the particular legal issues;" (3) "the degree to which factual investigation will be required and the ability of the indigent plaintiff to pursue such investigation;" (4) whether the "case is likely to turn on credibility determinations;" (5) whether "the case will require testimony from expert witnesses;" (6) whether "the claims are likely to require extensive discovery and compliance with complex discovery rules;" and (7) the "plaintiff's capacity to retain counsel on his or her behalf." *Tabron*, 6 F.3d at 155–57; *Montgomery*, 294 F.3d at 499. Also, "courts should exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases." *Montgomery*, 294 F.3d at 499 (citing *Parham*, 126 F.3d at 458).

In this case, the court finds that it would be premature to appoint counsel to represent Geiger in this matter. Based on the court's screening of Geiger's original complaint and resolution of his request to amend that complaint, Geiger does not have any pending causes of action which will not be stayed pending resolution of his criminal proceedings. As the court is abstaining from addressing those stayed claims, the court cannot analyze whether any of those claims have merit. Yet, many, if not all of them are dependent on Geiger achieving a positive outcome in his criminal case. In addition, as to those claims which the court has addressed, none of them have merit as Geiger has failed to state any plausible cause of action against any defendant. Therefore, the court will deny Geiger's request for the appointment of counsel at this time, but if the court permits him to proceed on any of his stayed claims once his criminal case has concluded, Geiger may move

again for the appointment of counsel and the court will consider his request in conjunction with the type of claim(s) moving forward.[53]

## C.     **Request for Entry of Default**

The final pending request in this case is Geiger's request that the court enter default against Officer A. McChord. *See* Doc. No. 16. This request is easily disposed of because it is utterly frivolous in all respects, despite Geiger "declar[ing] under penalty of perjury" that the statements contained in the request are "true and correct." Decl. for Entry of Default ("Decl.") at ECF p. 1, Doc. No. 16. The frivolousness of this submission starts with Geiger's acknowledgment that he filed his initial complaint with the court on June 22, 2022.[54] *See id.* Geiger then purports that the Marshals somehow served Officers Mawson and A. McChord (as Geiger's excessive force claims against them were the only claims the court permitted to go out for service) on June 22, 2022, the

---

[53] Given Geiger's unapologetic sovereign-citizen status, he may not be cognizant of the fact that in his amended complaint, he describes his dissatisfaction with **every** attorney who has been assigned to represent him in his criminal matter except, perhaps, PD Unknown, even though he names her as a defendant in this case. Geiger claims to have fired several public defenders who had been assigned to represent him in his criminal case, and the undersigned cannot recall seeing another criminal case where an individual defendant had been assigned so many different defense attorneys in a single criminal matter.

    Also, while it is surely within Geiger's right to file a complaint with the Office of Disciplinary Counsel for the Disciplinary Board of the Supreme Court of Pennsylvania if an attorney assigned to him has behaved unethically, he has filed disciplinary complaints against several of his prior defense attorneys. *See, e.g.*, Compl. at ECF p. 16 (attaching Office of Disciplinary Counsel letter indicating Geiger had filed complaints against four of his defense attorneys, three of which are specifically identified in his amended complaint). While it is not outside the realm of possibilities that four different defense attorneys could commit ethical violations during their separate representations of one criminal defendant, there is a very small probability of that happening.

    Overall, considering Geiger's sovereign-citizen views, his negative interactions (as he describes them) with his assigned defense attorneys, and his descriptions of his own obstructionist behavior in the courtroom where he proudly admits to refusing to even state his own name for the record because of his apparent adherence to contortions of the law, *see, e.g.*, Am. Compl. at ECF pp. 11 (providing reasoning for not stating name in court), it is highly unlikely that any appointed counsel will be able to assist Geiger in prosecuting any of his claims in this case should he be permitted to do so after his criminal case concludes. Moreover, no attorney is going to embrace and assert the frivolous sovereign citizen arguments Geiger is attempting to assert in this case, which would very likely result in appointed counsel withdrawing and Geiger having to proceed *pro se*. For example, no attorney is going to file Geiger's "Legal Notice! Name Declaration, Correction [sic] Proclamation and Publication" or his purported "Affidavit of Nationality," which is also titled, "Judicial Notice and Proclamation," which he included with his proposed amended complaint, *see* Am. Compl. at ECF pp. 40–47, because those documents are void, i.e., have absolutely no legal significance in any courtroom (state or federal) in the United States.

[54] As indicated earlier in this opinion, June 22, 2022 was the date that the clerk of court docketed the complaint, and not the date the court has used as the complaint's filing date per the prisoner mailbox rule.

same date that the clerk of court docketed his initial complaint. *See id.* What is especially interesting about the re-use of this June 22, 2022 date is that Geiger had written the month of December as the service month in his declaration, *see id.*, but then crossed it out and wrote June instead. *See id.* Geiger next goes on to indicate that Officer A. McChord, who had never been served with the complaint, *see* Doc. No. 13 (Marshal's November 3, 2022 return of USM-285 form for no service on Officer A. McChord), failed to file a response to the complaint and, as such, asks that the clerk of court enter default against him. *See* Decl. at ECF p. 1. At bottom, Geiger requested the clerk of court to enter default against a defendant who had not been served (due to Geiger's inability to properly name him, at least per the City's Law Department) based on an allegation that this defendant had been served by the Marshals approximately three months prior to the court directing the clerk of court to issue summons for Officers Mawson and A. McChord and transmit them and copies of the complaint to the Marshals so the Marshals could serve the two defendants. *See* Sept. 29, 2022 Order at 3. This court will not countenance Geiger's attempt at manipulation to obtain the entry of default against Officer A. McChord. Accordingly, the court will strike Geiger's request for entry of default against Officer A. McChord.[55]

---

[55] There would be a possible lack of service of process issue under Rule 4(m) if the court was not dismissing the only claim from Geiger's original complaint that the court had not stayed in the case. It has been well more than 90 days from when the court directed the clerk of court to issue summonses for Officers Mawson and A. McChord and transmit them along with copies of the complaint to the Marshals for service. To date, there is no proof that Officer A. McChord has ever been served with the original complaint. *See* Fed. R. Civ. P. 4(c)(1) (requiring plaintiff to serve summons with copy of complaint); Fed. R. Civ. P. 4(m) (requiring plaintiff to serve defendant with process "within 90 days after the complaint is filed"). This failure is due to Geiger not providing the Marshals with sufficient information to serve this defendant. In these circumstances, dismissing any claims against Officer A. McChord would have been a possible outcome for Geiger's failure to provide sufficient information to the Marshals so they could serve Officer A. McChord. *See, e.g., Novak v. Posten Taxi, Inc.*, 386 F. App'x 276, 277 n.1 (3d Cir. 2010) (per curiam) (affirming dismissal of *pro se* plaintiff's complaint where plaintiff was proceeding *in forma pauperis* and failed to provide addresses to court so United States Marshals could effect service); *Nichols v. Loppe*, Civ. A. No. 2:19-cv-2264, 2020 WL 6750562, at *1 (E.D. Pa. Oct. 23, 2020) (dismissing action without prejudice due to *pro se* plaintiff's "failure to timely provide information for the United States Marshal to effectuate service as directed multiple times"); *Carson v. Wetzel*, Civ. A. No. 17-73 Erie, 2019 WL 9654835, at *2 (W.D. Pa. Feb. 5, 2019) (dismissing action for failure to prosecute where *pro se* plaintiff failed to "take[] the initial steps to effectuate service and . . . ignored the Court's directive to supply the requisite USM-285 forms" to allow the Marshals to effect service);

### III.    CONCLUSION

For the reasons set forth above, the court will deny in part and grant in part Geiger's motion for leave to file an amended complaint. The court will deny the motion to the extent that Geiger attempts to assert any causes of action against any defendant other than for false arrest, false imprisonment, and illegal search in violation of the Fourth Amendment. As for these three causes of action, the court will grant Geiger leave to amend his complaint to assert such claims, but will also stay consideration of them until Geiger's criminal case has resolved. The court will also request that counsel for Officer Mawson provide the court with updates every 60 days about the status of Geiger's criminal case. In addition, the court will deny without prejudice Geiger's motion for appointment of counsel and strike his request for entry of default against Officer A. McChord.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.